# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMIE BELOTTI and BECKY BELOTTI** | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| vs. | : | 3:22-cv-01284- MEM |
| | : | |
| | : | |
| **STATE FARM FIRE AND** | : | **JURY TRIAL DEMANDED** |
| **CASUALTY COMPANY** | : | |
| Defendant. | : | |

## PLAINTIFFS, JAMIE BELOTTI AND BECKY BELOTTI'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Plaintiffs, Jamie Belotti and Becky Belotti oppose the Motion of Defendant, State Farm Fire and Casualty Company to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1). Defendant argues that the Court should dismiss the Complaint in its entirety, because 1) Plaintiff asserted sufficient facts for a bad faith claim, 2) stated a valid claim for violation of the Illinois Consumer Fraud Act, 3) states a viable claim for declaratory relief, 4) states a viable claim for breach of contract, and 5) incurred substantial additional cost. The Court should reject these arguments for the reasons set forth herein.

## I. BACKGROUND

Plaintiffs filed this action containing contractual and extra-contractual/statutory bad faith counts, as well as other claims pertaining to an insurance claim they submitted to Defendant as a result of a fire loss occurring at their residential premises on September 24, 2019. Defendant filed a Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## II. LEGAL STANDARD

A Motion to Dismiss for Failure to State a Claim pursuant to Fed. R. Civ. P. 12(b)(6) "tests the legal sufficiency of a Complaint." *Jones v. HCA,* 16 F. Supp. 3d 622, 628 (E.D. Va. 2014). To survive such a motion, a Complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell At. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "[A] claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Jones,* 16 F. Supp. 3d at 628 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

A court considering this type of motion assumes that the facts alleged in the Complaint are true and views the Complaint in the light of most favorable to the Plaintiff. *Id.; See also Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982) (court considering a Motion to Dismiss "contend [ing] that a Complaint simply fails to allege facts upon which the subject matter jurisdiction can be based" affords the Plaintiff "the same procedural protection as [the Plaintiff] would receive under a Rule 12(b)(6) consideration").

## III. ARGUMENT

### POINT I

### PLAINTIFFS HAVE ASSERTED SUFFICIENT FACTS TO SUPPORT THEIR STATUTORY BAD FAITH CLAIM

The Pennsylvania Legislature enacted Pennsylvania's bad faith statute, 42 Pa. C.S. § 8371 to address circumstances where an insurer fails to act in good faith in response to an insurance claim. In this case, the Plaintiffs will establish at trial that a significant fire caused catastrophic destruction to their residential premises and personal property and caused them to sustain other losses. The Plaintiffs submitted a first party claim to Defendant, which has yet to be fully paid. The Plaintiffs are also prosecuting statutory bad faith claims, as set forth in Paragraph 17 of their

Complaint, with specificity. The Defendant argues that the Plaintiffs bad faith claims should be dismissed, as they provide only a conclusory laundry-list of alleged violations without supporting facts. To the contrary, the Plaintiffs' Complaint alleges, *inter alia*, that the Defendant low-balled their insurance claim, which was proven by an Appraisal Award substantially in excess of the amount that Defendant was willing to pay. The Plaintiffs also aver, with specificity, that the Defendant improperly interfered with and attempted to corrupt the appraisal process, arbitrarily changed and edited its building consultant's report in order to severely undervalue the Plaintiffs' claim, sought to obtain a release of the extra-contractual claims as a condition of making contractual payments, and engaged in a pattern of conduct in its estimating software by attempting to manipulate the application such that the Plaintiffs' loss would be characterized as "new construction", rather than restoration/service/remodel, such that the Plaintiffs' claim would have been substantially undervalued. None of these allegations are conclusory, and they only read as a laundry list due to the massive scope of the Defendant's unreasonable, bad faith response and mishandling of the Plaintiffs' claim.

The Pennsylvania Supreme Court has held that, "in order to recover in a bad faith action, the Plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017) (adopting test first articulated in *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. 1994)). Further, "proof of an insurer's motive of self-interest or ill-will, while potentially probative of the second prong, is not a mandatory prerequisite to bad faith recovery under Section 8371." Id. at 377.

# POINT II

## COUNT II FOR VIOLATION OF THE
## ILLINOIS CONSUMER FRAUD ACT STATES A VALID CLAIM

At Count II of the Complaint (¶¶ 62-77) Plaintiffs allege, separate and apart from policy breaches, a series of "unfair or deceptive acts and practices." (Complaint ¶ 71). Plaintiffs allege that these actions and practices are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act.

The Illinois Consumer Fraud Act declares ". . . unlawful" "unfair methods of competition and unfair or deceptive acts or practices. . ." ICFA protects "consumers, borrowers, and businesspersons against fraud, unfair methods of competition and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 9334 (7th Cir. 2010). "The CFA was intended to afford a broader range of protection than the common law [citations omitted] and to curb fraudulent abuses, while eradicating deceptive and unfair practices . . . "the elements necessary to establish fraud under the CFA are less stringent than elements necessary to establish common law fraud." [citations omitted] *Avery v. State Farm,* 746 N.E. 2d 1242 (2001) Ill. Dec. 194, 213.

Defendant argues that the ICFA claim should be dismissed first because "it does not have extra-territorial effect" Deft. Br. at 11-12; second because it is pre-empted by Illinois Insurance Code, 215 ILCS 5/155 and third because plaintiff's claim is "merely a breach of contract or conduct proscribed by Section 155." *Id*. at 12. Should these arguments fail, Defendant argues, Plaintiffs' "fail to adequately allege an ICFA claim."

As to extra-territoriality, Defendant argues that there are "no facts connecting their claims to the State of Illinois apart from the fact that State Farm is headquartered there." Deft. Br. at 11. Accordingly, Defendants argue, under *Avery v. State Farm Mutual Auto Ins. Co.*, 835 N.E. 2d 801,

853 (Ill. 2005); *Crichton v. Golden Rule Ins. Co.*, 576 F.2d 392, 396 (7th Cir. 2009); *Gridley v. State Farm Mut. Auto Ins.*, 840 N.E. 2d 269, 275 (Ill. 2005); *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 771 (N.D. Ill. 2021) the ICFA claim must be dismissed.

State Farm misstates the pleading. Plaintiffs allege more than "headquarters" allegations as a basis for application of the ICFA. *See* Complaint ¶¶ 15, 16, 17. In addition, the Policy was signed by State Farms corporate officers in Bloomington, Illinois. (*See* ECF 9-2 43 of 44) which demonstrates that the policy language with its allegedly deceptive language was formulated in Illinois but also that the signing of the contract, an essential act for validity of the insurance contract, took place in Illinois. Illinois state courts and federal courts within Illinois have applied the ILCFA on behalf of out-of-state residents against an Illinois Defendant where conduct occurs in Illinois. Illinois's Fifth District Appellate Court has held:

> "The CFA does not limit its application to resident consumers. To deny an out-of-state plaintiff a remedy against a resident of Illinois would violate the legislative directive that the CFA be liberally construed to achieve its remedial purposes. Non-Illinois consumers have been permitted to pursue an action under the CFA against a resident defendant where the deceptive acts and practices were perpetrated in Illinois."

*Avery supra* at 281 citing the Illinois Supreme Court in *Martin v. Heinbold Commodities, Inc.*, 117 Ill. 2d 67, 83, 109 Ill. Dec. 772, 510 N.E. 2d 840, 847 (1987).

In *Avery*, the Court justified application of the law to a non-resident's claims for insured auto repairs by noting: "There is substantial evidence that the deceptive claims practices were designed, established, and initiated from State Farm's corporate headquarters in Bloomington, Illinois and dictated and disserted . . . nationwide" *Id.* at 284. On appeal to the Illinois Supreme Court, *Avery v. State Farm*, 216 Ill. 2d 100, 296 Ill. Dec. 448, 835 N.E. 2d 801, the Supreme Court agreed with the Appellate Court's recitation of the law:

> We agree with the appellate court that the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining "[whether ICFA] should be applied."

Here the complaint explicitly alleges that State Farm corporate headquarters controls the practices alleged herein. Complaint ¶¶ 15 and 16. State Farm's policy was in fact signed by Defendant's "Secretary" and "President" *see* ECF 9-2 page 44 of 44. The policy itself states "this Company has caused this policy to be signed by its President and Secretary at Bloomington, Illinois." *Id*.

Defendants further argue that even if Plaintiffs themselves could argue for extraterritorial application of the ICFA, such claims could not be asserted on behalf of individuals in states other than where Plaintiffs reside or have suffered injury. *Id*. at 12, n.3. In support, Defendant cites: *In re Niaspan Antitrust Litigation*, 2015 WL 8150588 (E.D. Pa., Dec. 8, 2015); *Xi Chen Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389, 391 (W.D. Pa. 2014); and *In Re Wellbutrin XL Antitrust Litigation*, 260 F.R.D. 143, 158 (E.D. Pa. 2009). However, arguments about the proper composition of the class should await class certification. Prima facie, a nationwide class of insureds or a multi-state class can be certified. "A multi-state class action based on the Consumer Fraud Act is not a novelty in Illinois" *P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp.*, 345 Ill. App. 3d 992, 1003 (Ill. App. 2004) citing *Gordon v. Boden*, 586 N.E. 2d 461 (Ill. App. Ct. 1991) appeal denied (591 N.E. 2nd 21 (Ill. 1992), *cert denied*, *Bodines, Inc. v. Gordon*, 113 S. Ct. 303 (1992); *Fay v. UAL Corp.*, 136 F.R.D. 626, 637 (N.D. Ill. 1991).

State Farm also argues that the ICFA sounds in contract only and therefore must be dismissed. *Id*. at 13. The allegations of the complaint previously cited (62-77, esp 71) clearly demonstrate that the allegations supporting this claim go well beyond a policy breach allegation. A similar argument was asserted and rejected in *Labella Winnetka, Inc. v. General Cas. Ins. Co.*,

259 F.R.D. 143 (N.D. Ill. 2009). In that case, the Defendant insurer was sued for failing to pay "the full amount that it owes" under a fire insurance policy on plaintiff's restaurant. The plaintiff alleged a variety of wrongful acts by the insurer to obstruct "plaintiff's attempts to move back into the premises and reopen its restaurant" "in order to avoid full payment to plaintiff." The Court rejected the insurer's argument that plaintiff had only alleged a simple breach of contract and held: ". . .although plaintiff does not include a great deal of detail in its complaint, plaintiff alleges precisely that which it ultimately must prove under Illinois law" *i.e.*, "a deceptive act or practice."

Defendant's Illinois Insurance Law 155 preemption argument fares no better than its contract breach argument above. Its authorities are inapposite because those cases aver only ordinary breach of insurance policy claims, not claims of deceptive practices both before and after the insureds entered into the policies and allege unfair or deceptive practices. *See e.g. Cramer v. Insurance Exchange Agency*, 675 N.E. 2d 897, 900 (Ill. 1996); *Cook, ex rel. id. Cook v. AAA Life Ins. Co.*, 13 N.E. 3d 20, 33 (Ill. App. Ct. 2014); *Leona's Pizzeria Inc. v. NW Nat. Cas. Co.*, 203 F. Supp. 2d 930, 933 (N.D. Ill. 2002).

## POINT III

### THE COMPLAINT STATES A VIABLE CLAIM FOR DECLARATORY RELIEF AND CANNOT BE DISMISSED PURSUANT TO RULE 12b-1

State Farm argues that the declaratory relief claim should be dismissed if the contract claim is dismissed because the breach of contract claim is the predicate for the Declaratory Judgment claim. State Farm Br. 15-16. Defendant also argues that since the Declaratory Judgment claim is duplicative of the contract claim it is the Declaratory Judgment claim which should be dismissed. State Farm cites *Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 233, 236 (E.D. Pa. 2019); *United States v. Vantage Tr. Fed. Credit Union*, No. 3:17-cv-0348, 2018 WL 306920 at *7 (M.D. Pa. Jan. 5, 2018). Plaintiffs contend that it is premature to dismiss a declaratory judgment claim in a class

action because of some overlap between the declaratory judgment claim and other claims. see generally, Gooch v Life Investors Insurance Company of America, 2012 App LEXIS2643 ( 6th Cir Feb 10, 2012) (discussing appropriateness of certifying a Rule 23 (b)(2) class for declaratory judgment in the context of a class representative claims for damages only.

**POINT IV**

**PLAINTIFFS STATE A VIABLE CLAIM FOR BREACH OF CONTRACT**

Pennsylvania jurisprudence, like most other jurisdictions requires that in bringing a breach of contract claim, a plaintiff must prove three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." See Omicron Systems Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004). As discussed in greater detail below, the Complaint satisfies these elements and, therefore, precludes dismissal under Rule 12(b)(6).

Before addressing the viability of Plaintiffs' breach of contract claim, it is worth reviewing State Farm's argument that "Plaintiffs fail to state a claim for breach of contract (Count III)" as it improperly attempts to reframe the issue. Br. At 4-8. Specifically, State Farm's breach of contract argument dodges all of the Complaint's well-pleaded allegations and then creates and destroys the straw man arguments it has itself raised. Defendants argue that Plaintiffs breach of contract claim must be dismissed because "plaintiffs fail to allege any policy provision was breached." State Farm argues that its obligation is to pay "the cost to repair or replace" the damaged property only according to a two-step loss settlement provision." Br. at 5. State Farm contends that under the two-step contractual process, "payment is first made for 'the actual cash value of the damages part of the property' followed by payment for any additional amounts

'actually and necessarily' spent on covered repairs of the damaged property." Br. at 6, citing Policy at 11.

Ignoring the allegations of the Complaint describing the breach, State Farm argues "plaintiffs do not allege that they received less than the actual cash value of the covered damage to their home or that State Farm failed to pay any amounts they actually and necessarily spent on repairs." Br. at 6. Their argument fails to support State Farm's bottom line that Plaintiffs have failed to identify any "specific policy provision breached by State Farm." *Id.* State Farm thus distorts Plaintiffs' coverage claim into a dispute about its obligations to use any "specific repair estimating software." Br. at 5-6.

State Farms' argument that this case is not about a contract breach but only about a method of estimating a loss should be rejected here just as it was in *Mitchell v. State Farm Fire and Casualty Company*, 327 F.R.D. 552 (N.D. Miss. 2018). In *Mitchell*, like this case, involved the Xactimate system settings selected by State Farm. But the Court brushed aside State Farm's mischaracterization and held:

> The issue here is not whether actual cash value payments eventually paid by State Farm were reasonable or sufficient, but rather whether State Farm was entitled to deduct labor depreciation from its insureds in the first place.

While *Mitchell* was deciding a Rule 23 motion, the Court was required to analyze the nature of the contract breach claims. The Court ultimately granted Rule 23(b)(3) certification. *Id.* at 565. ECF 9-2, page 16 of 44.

Further, State Farm's attempt to paper over the breach by relying on the appraisal process is misplaced. The breach occurred before the appraisal process was invoked which damaged the Plaintiffs. Moreover, the breach continues as the appraisal award set out a replacement cost value for the loss in the amount of $268,879.70 with a depreciation holdback of $26,738.20. See

State Farm Summary of Loss annexed hereto as Exhibit "1." In order to collect the holdback the Policy requires that Plaintiffs "complete the actual repair or replacement of the damaged part of the property within two years after the date of loss." See Exhibit "2" at p. 11. Plaintiffs submitted documentation in support of their demand for the holdback. See Exhibit "1." State Farm has not paid the holdback although it was duly demanded thereby breaching the policy.

Even if State Farm now pays the holdback, it does not remedy its breach of the policy. The policy required that State Farm "pay the cost to repair or replace with **similar construction**…the damaged property (emphasis added)." Exhibit "2" at p. 11. In its moving brief, State Farm does not seem to dispute that the use of the "new construction" valuation method was inappropriate, but rather that the subsequent appraisal vitiated any prior impropriety as the appraisal award established the loss. Br. At p. 6. In short, State Farm takes a" No harm, no foul" position.

What State Farm ignores is that it breached the policy way before appraisal. The breach occurred precisely when it knowingly and purposefully used an improper estimation method to value the "cost to repair or replace [the Plaintiffs' damage] with similar construction." Exhibit "2" p. 11. The subsequent reliance on the Policy's appraisal provision as a panacea for the prior breach of duty to properly value the damage is misplaced. The appraisal provision should be viewed as a stipulated alternative dispute resolution method in the event State Farm and the insureds "fail to agree on the amount of loss." Exhibit "2" p. 14.

Further, to the extent that State Farm argues that "a breach of contract claim cannot be based on the 'specific method of estimation' [because] [t]he policy does not prescribe a specific method of computation nor require a specific method of estimation" is disingenuous at best. Br. P.5. State Farm ignores that the policy's declarations pages specifically states that if a

10

prospective insured requests to have State Farm estimate the value of its property, a State Farm "agent can provide an Xactware[1] estimate as a valuation method to estimate the replacement cost of the insured property.[2] Exhibit "2" (p. 6 of 44) in Brief. Thus, while State Farm will allow a prospective insured to provide estimates, its agents will rely on Xactaware. Accordingly, a reasonable insured would expect State Farm to use Xactware's estimating platform to value a loss.

Xactware offers a robust menu of options for valuation and, therefore, publishes a summary guide to in order to provide "information related to Xactaware's methodology, options, and product features for creating estimates." Exhibit "3" at p. 2. Regarding the proper labor cost valuations, the summary offers the following guidance, in relevant part:

### LABOR EFFICIENCIES AND MINIMUMS*

> Xactimate offers two options from which to select in the Estimate Parameters window. Each of which applies a different labor productivity rate and therefore labor cost based on the type of job. The options from which to select are:
> Restoration, Service, and Remodel This labor efficiency model can be used in partial loss restoration and remodeling work and includes an assumed amount of time per day spent working in a restoration or remodel environment. This includes factors such as set up of the work or cutting area outside the structure, working around contents, etc.
> New Construction Total (**ground-up**) reconstruction or in some cases portions of a large partial loss can be addressed by selecting the "New Construction" labor efficiency in the Estimate Parameters window. This efficiency utilizes the same costs for material and labor rates but employs a higher productivity rate for labor **and therefore a slightly lower labor cost in many trades.** (Emphasis added).

Exhibit "3" at p. 3.

Xactaware makes clear that "new construction" valuations should be used in "ground-up reconstruction" while "restoration and remodeling" pricing in "partial loss restoration[s]." Id.

---

[1] Xactware Solutions provides computer software solutions for professionals involved in estimating all phases of building and repair. In 1986, Xactware opened for business with Xactimate, its flagship estimating system. See https://www.xactware.com/company/about

[2] The "Your coverage amount…." section does allow prospective insureds to rely on other estimates, but clearly establishes that its agent will use an "Xactware estimate using information [the insured] provide[s]." Exhibit "__" p. __ (p. 6 of 44) in Brief.

11

Not surprisingly, the "new construction" valuation method results in "slightly lower labor costs" across "many trades" due to the labor efficiencies. Id. State Farm's knowing use of the wrong labor valuation was contrary to its obligation under the policy to "pay the cost to repair or replace [the damage] with similar construction" and, therefore, constitutes a breach. Exhibit "2" at 11.

The damages incurred by this breach are patent. Faced with an inadequate estimate that would not satisfy the cost to repair or replace their home, the Plaintiffs were left with but two options: they could have sought indemnification through the courts or invoked the alternative dispute resolution route for fixing valuation issues – appraisal. They chose the latter. However, the appraisal process is not inexpensive. In addition to the delay, the policy obligates policyholders to pay for the cost of their selected appraiser as well as half the cost of an umpire. Exhibit "2" at p. 14. Of course, these additional costs are not recoverable at any stage in the appraisal process and, therefore, place insureds in the unenviable position where they are never going to be made whole. This deprived Plaintiffs of the benefit of the coverage they purchased according to policy provisions.

The foregoing is precisely what was pleaded in the Complaint.[3] The well-known framework of R. 12(b)(6) requires that this Court accept the pleaded allegations as true. Here, the Complaint sets out a valid breach of contract claim that precludes dismissal at this juncture.

---

[3]  82. State Farm breached the contract by failing to value and adjust Plaintiffs' partial loss reasonably using "repair/reconstruction pricing" choosing instead to use "new construction" pricing to undervalue and underpay Plaintiffs' claim.

83. As a result of the breach, Plaintiffs and members of the Sub-Class have been damaged in an amount representing the difference between "repair/replacement" pricing and "new construction" pricing plus the costs of collection including the expense of unnecessary Appraisal, legal fees and consequential damages.

Complaint, ¶¶ 82. 83

Accordingly, this Court must deny that branch of State Farm's motion seeking dismissal of Plaintiffs' breach of contract claim as Plaintiffs have stated a valid breach of contract claim.

## POINT V

**STATE FARM'S ARGUMENT THAT PLAINTIFFS HAVE SUFFERED NO DAMAGES BECAUSE THEY DO NOT CHALLENGE THAT APPRAISAL AWARD IGNORES THE SUBSTANTIAL ADDITIONAL COSTS INCURRED BY PLAINTIFFS DUE TO DEFENDANT'S BREACH OF POLICY COVERAGE TERMS**

The fact that Plaintiffs were paid for their claim after an appraisal process does not preclude this action for damages. Here it is alleged that State Farm's breach of coverage terms (where State Farm persisted using a total loss model to rely on its "new construction" figures) which forces the insured into an appraisal process, which is expensive and time consuming for insureds.

As a result of the breach, Plaintiffs and members of the Class have been damaged in an amount representing the difference between "repair/replacement" pricing and "new construction" pricing plus the costs of collection including the expense of Appraisal, legal fees and consequential damages. Such damages were incurred solely as a result of the breach and are thus direct damages and/or are compensable consequential damages under Pennsylvania law because State Farm knew, and created, the circumstances responsible for loss and the injury was foreseeable

Pennsylvania law recognizes two types of contract damages: (1) general damages, which are those that flow directly from the breach (also referred to as ordinary or compensatory damages); and (2) special (or consequential) contract damages, which occur as a result collateral losses such as expenses incurred, or gains prevented because of the breach. *Baynes v. George E. Mason Funeral Home, Inc.,* Civ. No. 3-153, 2011 WL 2181469 (W.D. Pa. June 2, 2011) (citing *LBL Skysystems (USA), Inc. v. APG-America, Inc.,* 319 F. Supp. 2d 515, 523 (E.D. Pa. 2004) (citations omitted)); McDermott *v. Party City Corp.,* 11 F. Supp. 2d 612, 624 (E.D. Pa. 1998).

General damages are those that flow from the usual and ordinary circumstances following the breach. *Fort Washington Res., Inc. v. Tannen,* 901 F. Supp. 932, 943 (E.D. Pa. 1995); *Parsons Trading Co. v.* Dohan, 167 A. 310 (1933). In contrast, special or consequential damages are those that are not usual and ordinary consequences of the breach. *McDermott,* 11 F. Supp. 2d at 624. Rather, they depend on special circumstances. *Tannen,* 901 F. Supp. at 943.

Normally, a breaching party is liable only for the general damages that would naturally result from the breach. *See* RESTATEMENT (SECOND) OF CONTRACTS § 351(2a) ("Loss may be foreseeable as a probable result of a breach because it follows from the breach in the ordinary course of events."); McDermott, 11 F. Supp. 2d at 624. However, the breaching party may also be liable for consequential damages if "it is shown specifically that the defendant had reason to know of the circumstances responsible for the special damage and [the ability] to foresee the injury." *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854); *McDermott,* 11 F. Supp. 2d at 624 (foreseeability of consequential or "special" damages is determined based on the parties' understanding at the time of contract). Thus, to recover consequential damages, a plaintiff must show that at the time the contract was entered, "the damages subsequently claimed were in the reasonable contemplation of the parties." *Keystone Diesel Engine Co. v. Irwin,* 191 A.2d 376, 378 (Pa. 1963).

### IV. CONCLUSION

The Court should deny Defendant's Motion to Dismiss the Complaint.

                      Respectfully submitted,

                      **WILKOFSKY, FRIEDMAN KAREL & CUMMINS**

                      By: *s/Harry Cummins*
                              Harry Cummins, Esquire

Dated: October 21, 2022