**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMIE BELOTTI, et al.,** | |
| Plaintiffs, | CIVIL ACTION NO. 3:22-CV-01284-MEM |
| vs. | **JURY TRIAL DEMANDED** |
| **STATE FARM FIRE AND CASUALTY COMPANY,** | |
| Defendant. | |

<u>**SECOND AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs Jamie Belotti and Becky Belotti, by and through their undersigned counsel, as and for their Second Amended Class Action Complaint, against Defendant, State Farm Fire and Casualty Company (hereinafter, "State Farm"), allege the following, upon their own personal knowledge as their own policy and loss thereunder and upon information and belief as to all other matters:

## I.    <u>THE PARTIES</u>

1.     Plaintiffs, Jamie Belotti and Becky Belotti are competent adult individuals currently residing at 409 Pittston Ave, Avoca, PA 18641.

2.     At all relevant times, Plaintiffs, Jamie Belotti and Becky Belotti were owners of residential premises located at 156 Foote Avenue, Duryea, Pennsylvania.

3.     Defendant, State Farm Fire and Casualty Company, is an Illinois corporation authorized to conduct business in the Commonwealth of Pennsylvania with its headquarters office located at 1 State Farm Plaza, Bloomington, Illinois.

4.     At all times relevant and material hereto, the Defendant, State Farm, was authorized to issue insurance policies in the Commonwealth of Pennsylvania.

## II.    JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(d) the Class Action Fairness Act because Plaintiffs are citizens of a state different than Defendant, there are more than 100 putative class members and there is more than $5 million in controversy.

6.      Venue is proper in this jurisdiction under 28 U.S.C. 1391(b) and (c) because the property in question is located in this district and State Farm conducts business in this district.

## III.    CLASS ACTION ALLEGATIONS

7.      Plaintiff brings this action under Rule 23(b)(2) and (b)(3) *et seq.* on behalf of themselves and a class of all other homeowners' Policyholders in the Class Period throughout the USA:

> All persons insured by Defendant under homeowners' policies in any state who, from January 22, 2016 or the earliest allowable time (as per applicable statutes of limitations) through the date of resolution of this action (the "Class Period"), received first-party property damage new construction valuation and payment on a partial damage loss claim that included new construction valuation estimate.

8.      If necessary, and in the alternative, Plaintiffs bring this action on behalf of the following proposed State Subclasses:

> The Pennsylvania Subclass. All Pennsylvania citizens insured by Defendant under homeowners' policies who, from January 22, 2016 or the earliest allowable time through the date of resolution of this action ("the Sub-class Period'), received a first-party property damage new construction valuation and payment on a partial damage loss claim that included a new construction valuation estimate.

9.      Plaintiffs reserve their right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

10.    This action is properly maintainable as a class action under Rule 23(b)(2) and/or (b)(3) *et seq.,* because:

(a)    The Class (and Sub-class) is so numerous that joinder of all members is impracticable. State Farm sold millions of dollars of policies to Plaintiffs and members of the class during the Class Period.

(b)    Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other Class members whom they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

(c)    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

(d)    There are questions of law and fact that are common to the Class (and Sub- class) that predominate over any questions affecting only individual Class (or  Sub-Class) members. The common questions, include, *inter alia,* the following:

(i)    Whether the use of Xactimate' s "new construction" pricing as the basis of adjustment on losses requiring only "repair and remodeling" violate the policy in force;

(ii)    Whether the use of Xactimate's "new construction" pricing as the basis of adjustment on losses requiring only "repair and remodeling" violate the Unfair Claims Practices Act;

(iii)    Whether Defendant is liable to Plaintiffs and the Class;

(iv)    Whether Plaintiffs and the Class (and/or Sub-class) have suffered any damages;

(v)    Whether Defendant's failure to disclose its use and use of new construction estimate when determining partial payments for an insured property until such an assessment is made is deceptive to a reasonable consumer, unconscionable or otherwise a violation of the relevant consumer protection statute(s);

(vi)    Whether Defendant's practice of applying a new construction estimate in determining partial loss payments results in a breach of its contractual obligation and breach the covenant of good faith and fair dealing it has with Plaintiffs and the other Class members;

(vii)    Whether Defendant was unjustly enriched at the expense of Plaintiffs and the other Class members as a result of its conduct; and

(viii)    Whether Plaintiffs and the Class are entitled to injunctive relief based on Defendant's conduct.

11.    Plaintiffs' claims are typical of claims of the Class (and/or Sub-class).

12.    Plaintiffs will fairly and adequately protect the interests of the Class (and/or Sub-class) under Pa. R.C.P. 1709 and has retained counsel qualified to do so.

13.    A class action is a fair an efficient method for the adjudication of the controversy.

14.    Prosecuting separate actions by or against individual class members would create the risk of inconsistent or varying adjudication that would establish incompatible standards of conduct for State Farm.

15.    State Farm has acted and has refused to act on grounds that apply to the class making declaratory or injunctive relief appropriate.

**A.    The Pennsylvania Subclass**

16.    The policies issued to insureds on properties located in Pennsylvania are, as a matter of statute subject to Pennsylvania law, including but not limited, to Pennsylvania statute 42 PA. C.S.A. 8371 prohibiting "bad faith" handling of claims by insurers under insurance policies issued in Pennsylvania and Pennsylvanian Unfair Trade Practices And Consumer Protection Law ("UTPCPL") 73 PA. C.S.A. §201 et seq.

17.    The Pennsylvania Sub-class asserts claim under Pennsylvania statutory and common law.

**B.    The Nationwide Class**

18.    The application of Illinois law as the substantive basis for relief is appropriate because Illinois retains the most significant relationship to the occurrence and the parties. To the

extent Illinois law is not uniformly applicable, Plaintiffs reserve the right to seek certification of additional state subclasses.

19.    Defendant's principal place of business is in Illinois, and Defendant's deceptive practices with respect to scheme was developed in, and emanated from, Illinois.

20.    The form insurance Policies Defendant used to carry out its scheme were developed and drafted in Illinois.

21.    Illinois has a strong interest m regulating the conduct of companies headquartered in Illinois, particularly when they engage in fraud on a systematic and national level.

22.    The application of Illinois law to a national class will not present any difficulty.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    State Farm's Scheme And Common Course Of Conduct

23.    The aforesaid insurance policy with Defendant provided, *inter alia,* coverage for Plaintiffs' premises as described in the insurance policy. The terms offered to Plaintiffs are standard form terms used in all similar policies in Pennsylvania.

24.    In its policy form FP-7955 at page 11, "Section I - Loss Settlement" Coverage A – Dwelling:

> 1.    Al - Replacement Cost Loss Settlement - Similar Constitution
>
>> a.    We will pay the cost of repair or replacement with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under Section I - coverages, Coverage A- Dwelling, except for wood fences, subject to the following:
>>> 1.    Until actual repair or replacement is completed, we will only pay the actual cash value.

25.    The policy does not prescribe a specific method of computation nor require a

6

specific method of estimation.

26.     The policy terms applicable here *i.e.,* "... pay the cost to repair or replace with similar construction and for the same use... [of] the damages part of the property" does not include any provision allowing State Farm to use data driven estimating measures for total loss of an insured property which must be totally reconstructed; which are the subject of this action.

27.     State Farm is engaged in a pattern and practice whereby it systematically employs an estimation method ("new home construction pricing") not applicable to the insured whose property has suffered a covered partial loss to the insured premises and does not need to be totally replaced with "new construction."

28.     Allowing State Farm to pay for partial losses on the basis of total loss coverage is nowhere made a term of the policy nor disclosed in the Policy to be a part of any "Loss Settlement" provisions.

29.     Upon information and belief, State Farm is engaging in this conduct in multiple states and regions as a matter of its loss adjustment practice after an insured reports a property loss and thereby increases State Farm's profits by reducing the amount paid in claims. Plaintiffs are aware of similar practices in other regions such as New Jersey.

30.     In defiance of the policy terms to pay for "repair and replacement of "damaged part of the property covered," State Farm systematically, as a pattern and practice of estimating and paying losses to insureds uses cheaper "new construction" pricing models applicable to total losses rather than more expensive "repair and remodel" pricing models applicable to partial losses.

31.     Both models are standardized and are included in the "Xactimate" software system for estimating cost of repairs and reconstruction for residential and small business."

32.     Xactimate is owned by Insurance Services Offices (ISO), a member of Verisk Analytics family of companies which perform a wide range of modeling, rating, and policy-related services for the insurance industry including State Farm.

33.     State Farm retains the ability and control over the Xactimate system used to estimate losses to allow State Farm to override any outside "adjuster" or building consultant's use of the "repair and remodel" pricing database and instead switch to the "new construction" pricing model to estimate the loss.

34.     When an insurance company uses Xactimate, the program provides the user with a choice, which is described in the software advertising as follows: "Xactimate price lists can show costs based on work in restoration, service, or remodeling environments or based on a new construction environment."

35.     The definition of "new construction," both as used by Xactimate and in the insurance and construction industries at large, is a building that needs to be rebuilt in its entirety, from the foundation up, resulting from an actual or constructive total loss to the insured's property.

36.     The definition of "repair and remodel" in the context of an insurance loss, as used by Xactimate and in the insurance and construction industries at large, is a building of which some parts remain serviceable, subject to the rebuilding of the remainder of the property.

37.     Consistent with the general practice in the insurance industry and in the construction industry, for virtually every construction line item priced by Xactimate, the cost of that item for a repair and remodel is higher than the pricing of the same item for new construction.

38.     There are many reasons why the cost of repair and remodel is higher than new construction, including, for example only, the increased cost of demolition and preparation necessitated by the existing damage from a fire or other occurrence.

39.      The insurance industry standard for the use of the Xactimate program is that partial losses are priced using the program's "repair and remodel" pricing, and total losses are priced using the program's "new construction" database.

40.      Upon information and belief, all other insurers that use Xactimate price partial losses using "repair and remodel" pricing, and total losses using "new construction" pricing.

41.      Xactimate's pricing methodology summary "offers two options from which to select [labor efficiencies and minimums] in the Estimate Parameters window.  Each of which applies a different labor productivity rate and therefore labor cost based on the type of job." (Xactware Pricing Summary p. 3).

42.      New Construction labor is used in "ground-up" reconstruction or large partial losses, which results in a "lower labor cost in many trades."

43.      Conversely, repair, restoration, service, and remodeling labor is "used in partial loss restoration and remodeling work." (Id.)

44.      The policy of insurance only references Xactaware as the estimating platform used to "estimate[] the replacement cost of [the] home." (Policy p. 6 of 44).

45.      Xactimate     is     Xactware's     "flagship     estimating     system." (https://www.xactware.com/company/about#:~:text=In%201986%2C%20Xactware%20opened%20for,Xactimate%2C%20its%20flagship%20estimating%20system).

46.      Upon information and belief, for many years, prior to State Farm's initiation of its scheme to underpay claims as set forth herein, State Farm used the Xactimate program pricing for repair and remodel to estimate partial losses, and used Xactimate's pricing for new construction to estimate total losses.

47.     Beginning on an exact date not presently known to the Plaintiffs, State Farm discarded the industry practice, and its own prior practice, and started estimating some or all repair and remodel jobs using the Xactimate program's lower, "new construction" pricing.

48.     For reasons detailed above, in every instance this scheme has resulted in generating an estimate that is lower than the estimate that would have been generated using the appropriate numbers for repair and remodel on partial losses.

49.     As a result of this scheme, State Farm has routinely generated estimates that it knows full well to be below the fair and reasonable cost for the reconstruction of the insured's property.

50.     The purpose of the scheme was to enable State Farm to save money at the expense of its insureds by underpaying claims.

51.     The scheme has resulted m economic losses to all class members either by underpayment of claims or increased costs in time and money to insureds to get a claim paid correctly according to the policy terms.

52.     Where State Farm persists in relying on its new construction figures, but eventually pays more than the "new construction" estimate. the adjustment has been protracted and requiring the insured to either accept an offer below the amount to which the insured was entitled under the policy or to initiate litigation or other form of third-party resolution of the dispute at the insureds' own expense.

53.     In some cases, Insureds are coerced into the Appraisal process described in their policy which is expensive and time consuming for insureds.

54.     As designed and employed, State Farm's appraisal clause prevented, or imposed material costs and delays, upon the insured from effectively obtaining the benefits of the coverage and/or prevent insured from effectively vindicating their causes of action.

55.     As State Farm's Appraisers are directed by State Farm to voluntarily agree to enter into an appraisal award on the basis of "reconstruction pricing" and surrender the "new construction" pricing approach, rather than allowing the issue to be decided by the neutral umpire.

56.     Moreover, State Farm never discloses to insureds when it sells its property policies that:

(a)     It will use an estimating database to estimate loss payments;

(b)     It will use an Xactimate platform that has "repair and remodel" estimate models in addition to "new construction" models;

(c)     State Farm retains the ability to switch the choice of Xactimate's estimating models;

(d)     Xactimate is partially owned directly or indirectly by property and casualty insurers like State Farm;

(e)     The Xactimate Software uses regional data supplied overwhelmingly by company adjusters for its "repair and remodel" and "new construction" estimating models. For the most recent year for which data is publicly available, insurance company adjusters supplied 63.1% of estimates processed by Xactimate. By contrast, only 26% of estimates were supplied by insured's adjusters. Accordingly, the Xactimate data base used to create the estimating models has a low-ball bias; and

(f)     State Farm will delay a resolution of claims and then demand appraisal as a means of extracting concessions from insureds..

### B.    <u>Plaintiffs' Claims</u>

57.    At all times relevant and material hereto, in consideration of a premium paid by the Plaintiffs to the Defendant, Defendant issued and delivered to Plaintiffs an insurance policy, Policy Number 78-BJ-Zl 73-8, wherein Defendant insured Plaintiffs against losses to the property located at 156 Foote Avenue, Duryea, Pennsylvania as more particularly set forth on the Declarations Page of said Policy.

58.    The aforesaid insurance policy issued to Plaintiffs provided insurance coverage to Plaintiff's premises for the time period encompassing September 24, 2019.

59.    At all times relevant and material hereto, Defendant, State Farm, held itself out to the Plaintiffs as expert in insurance matters, and knew that Plaintiffs were justifiably relying upon the Defendant to provide proper and adequate insurance and related coverages.

60.    At all times relevant and material hereto, Defendant, State Farm, agreed and represented that it would obtain and maintain proper and adequate insurance coverage on Plaintiffs' property and would cause the necessary policy to the written and issued sufficient to provide Plaintiffs full protection against risks as described in the policy.

61.    On or about September 24, 2019 during the term the aforesaid  policy of insurance was in full force and effect, a fire damage loss occurred at Plaintiffs' property located at 156 Foote Avenue, Duryea, Pennsylvania, causing catastrophic damage to said property.

62.    The September 24, 2019 loss was a covered occurrence pursuant to the terms and conditions of the aforesaid insurance policy issued by Defendant, Policy Number 78-BJ-Zl 73-8.

63.    Plaintiffs duly notified Defendant of the aforesaid loss and made a proper claim under their policy with the Defendant, State Farm, for coverage and payment of Plaintiffs' loss.

64.    State Farm estimated the value of Plaintiffs' damage at  $175,451.05.

12

65.    Upon information and belief, State Farm's estimate in the amount of $175,451.05 utilized a labor efficiency rate based on New Construction labor rate, thereby lowering the labor costs in many trades.

66.    Plaintiffs' estimate for the repair of their damaged home was $374,069.77.

67.    On or about September 14, 2022, pursuant to the terms of the policy of insurance with State Farm, the Plaintiffs were forced to demand appraisal to attempt to compel State Farm to properly honor the terms of coverage.

68.    On or about October 14, 2022, pursuant to the terms of the policy of insurance, State Farm nominated its appraiser.

69.    On or about December 23, 2022, pursuant to the terms of the policy of insurance, an umpire was selected by the Plaintiffs' and State Farm's appraisers. 58. On or about February 1, 2022, the appraisal process concluded, and an appraisal award rendered (the "Award").

70.    The Award set the dwelling replacement cost benefit at $268,879.70.

71.    The recoverable depreciation was $26,738.20 (the "Holdback"), which as of the date of this amended complaint has not been paid, in breach of the Policy.

72.    The Plaintiffs elected to rebuild the dwelling at another location with an equivalent building intended for equivalent use.

73.    The Plaintiffs timely notified State Farm of their decision and received permission from State Farm.

74.    The Plaintiffs supplied various documents in support of their entitlement to the Holdback.

75.     All conditions precedent to Plaintiff's recovery under the aforesaid policy of insurance of Defendant, State Farm, Policy Number 78-BJ-Zl 73-8, and all conditions precedent to Defendant's liability thereunder, have been performed or have occurred, but Defendant, State Farm, has refused to act in good faith and meet its contractual obligations in accordance with industry standards, fair dealings practices and in accordance with its statutory obligations.

**COUNT I**

**BAD FAITH, 42 PA,C,S,A, § 8371**

76.     Plaintiffs incorporate the averments of paragraphs 1 through 69 as though same were fully set forth at length herein.

77.     Defendant, State Farm, has wrongfully and in bad faith responded to Plaintiffs claim.

78.     Defendant's handling of and response to Plaintiffs claim was with reckless disregard of the fact that such use of "new construction" pricing was without a reasonable basis, was contrary to policy terms and constitutes bad faith as the term "bad faith" is used in 42 Pa.C.S.A. § 8371.

79.     Defendant, State Farm has engaged in bad faith conduct, including, but not limited to, the following:

        (a)     by refusing to tender sufficient policy proceeds for the Plaintiffs' fire damage claim;

        (b)     by failing to make a reasonable effort to negotiate the timely settlement of the building claim which would have allowed the Plaintiffs to timely repair their premises;

        (c)     by failing to objectively and fairly evaluate the Plaintiffs' claim according to the terms of the Policy;

14

(d)     by compelling Plaintiffs to institute the costly and time consuming appraisal process <u>and</u> this lawsuit to obtain policy benefits that Defendant, State Farm, should have paid promptly and without the necessity of an appraisal and litigation;

(e)     by acting unreasonably and unfairly in response to Plaintiffs' claim;

(f)     by conducting an unfair, unreasonable, self-serving and inadequate investigation of Plaintiffs' claim;

(g)     by imposing unduly restrictive, self-serving interpretations of the policy of insurance upon Plaintiffs;

(h)     by failing to give equal consideration to fully paying the claim as to not fully paying the claim;

(i)     by compelling the Plaintiffs to engage in an unnecessary Appraisal;

(j)     by acting in bad faith during the appraisal process including inordinate delay and failing to act with dispatch with full knowledge that the Plaintiffs were continuing to suffer the consequences of their fire loss;

(k)     by low balling and extremely undervaluing the Plaintiffs' loss which has now been established by an Appraisal Award which was substantially in excess of the amount that the Defendant was willing to pay;

(l)     by attempting to exert undue influence upon its Appraiser;

(m)     by improperly interfering with and attempting to corrupt the Appraisal process;

(n)     by engaging in a pattern of conduct in its estimating of losses by attempting to manipulate the process such that the Plaintiffs' loss would be characterized and

valued as "new construction" rather than the more expensive, restoration/service/remodel such that the Plaintiffs' claim would have been substantially undervalued;

(o)    by retaining the services of a building consultant and arbitrarily changing and editing the consultant's report/estimate from a restoration/service/remodel characterization to a new construction characterization in order to severely undervalue the Plaintiffs' claim for its own financial benefit;

(p)    by seeking to obtain a release of the Plaintiffs' extra-contractual claims as a condition of making contractual payments as required by the terms and conditions of the policy;

(q)    by communicating the existence of coverage and later denying the existence of coverage; and

(r)    By misrepresenting policy provisions.

80.    Plaintiffs have suffered damages including delay, loss of coverage, and interest as described in the preceding paragraphs of this Complaint due to the Defendant's wrongful, bad faith handing of and response to Plaintiffs' claim and its failure to pay to Plaintiffs the monies to which Plaintiffs were clearly entitled to under Plaintiffs' insurance contract with Defendant, Policy Number 78-BJ-Zl 73-8.

81.    Defendant, State Farm, has acted in bad faith and with reckless disregard to the rights of the Plaintiffs in failing to fully pay Plaintiffs' claim pursuant to the terms and conditions of the insurance contract between the parties, Policy Number 78-BJ-Zl 73-8.

82.    Plaintiffs are entitled to the special damages provided for by 42 Pa. C.S.A. $ 8371 and to punitive damages.

## COUNT II

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT 815 ILCS 505/1(e)

83.      Plaintiffs repeat and re-allege all previously alleged paragraphs as if fully alleged herein.

84.      Plaintiffs bring this claim individually and on behalf of the Nationwide Class (for purposes of this Count, the "Class").

85.      Defendant, Plaintiffs, and the Class members are "persons" within the meaning of 815 ILCS 505/l(c).

86.      Plaintiffs and the Class members are "consumers" within the meaning of 815 ILCS 505/l(e).

87.      Defendant was and is engaged in "trade" or "commerce" within the meaning of 815 ILCS 505/l(f).

88.      The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CPA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

89.      As alleged herein, Defendant, through its agents, employees, and/or subsidiaries, violated the Illinois CPA by knowingly and intentionally concealing and failing to disclose material facts regarding the coverage of its policies and/or its practices with respect to estimating and adjusting property losses.

90.     By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts, as detailed above, Defendant engaged in one or more unfair or deceptive business practices prohibited by the Illinois CFA.

91.     Defendant's omissions regarding its adjustment and estimations of property losses were made to Plaintiffs and the Class members in a uniform manner.

92.     Defendant's unfair or deceptive acts or practices, as described above including its misrepresentations, concealments, omissions, and suppression of material facts by its use of "new home construction" pricing in lieu of the appropriate and more expensive "repair and remodel" pricing as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiffs and the Class members.

93.     Defendant had an ongoing duty to Plaintiffs and the Class members to refrain from engaging in unfair or deceptive practices under the Illinois CPA in the course of its business. Specifically, Defendant owed Plaintiffs and Class members a duty to disclose all the material facts regarding its loss calculations because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiffs and the Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

94.     Plaintiffs and the Class members were aggrieved by Defendant's violations of the Illinois CFA because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts.

95.    Plaintiffs and the Class members purchased Defendant's insurance coverage in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts regarding its loss coverage.

96.    Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiffs and Class members would not have purchased insurance coverage based upon use of "new construction" pricing in the event of partial losses from Defendant, or would not have paid as much for such coverage and, thus, they did not receive the benefit of the bargain and/or they suffered out-of-pocket loss.

97.    The Illinois CPA is applicable to Plaintiffs' claims and all class members because the policies of insurance at issue herein are developed, drafted, countersigned by State Farm and issued from Bloomington, Illinois. Defendants' wrongful conduct herein is a result of policies and practices directed from State Farm personnel in Illinois.

98.    Defendant's violations of the Illinois CPA present a continuing risk of future harm to Plaintiffs and the Class members.

99.    Plaintiffs and the Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the Illinois CPA and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Illinois CFA.

## COUNT III

## BREACH OF CONTRACT

100.    Plaintiffs repeat and reallege each and every allegation above as if more fully set forth herein.

101.    Plaintiffs bring this claim individually and on behalf of the PA subclass (for purposes of this Count, the" Sub-Class").

102.    State Farm in consideration of premiums paid to it by Plaintiffs issued to Plaintiffs a policy of insurance which included specific terms and conditions binding upon both parties as more fully set forth therein.

103.    The policy is a contract.

104.    The policy of insurance states that State Farm "will pay the cost to repair or replace" the damage on an actual cash basis "until actual repair or replacement is completed" (the "ACV").  (Policy p. 11).

105.    Thereafter, "when the repair or replacement is actually completed, [State Farm] will pay the covered, additional amount...actually and necessarily spen[t] to repair to replace the damaged property" (the "RCV"). (Policy p. 11).

106.    The Plaintiffs elected to rebuild the dwelling at another location with an equivalent building intended for equivalent use.

107.    The Plaintiffs timely notified State Farm of their decision and received permission from State Farm.

108.    The Plaintiffs supplied various documents in support of their entitlement to the Holdback.

109.    State Farm breached the policy of insurance by failing to pay and/or release the Holdback, despite same being duly demanded.

110.    Additionally, prior to Plaintiffs invoking appraisal, State Farm breached the policy of insurance by failing to properly calculate both the ACV and RCV, as the estimate was less than the estimated cost to "repair or replace the damaged property." (Policy p. 11).

111.    In the event that Plaintiffs and State Farm "fail to agree on the amount of loss," the policy of insurance allows for an appraisal of the loss to serve as an alternate path to "set the amount of the loss" (the "Appraisal"). (Policy p. 14).

112.    The Appraisal requires that "[e]ach appraiser...be paid by the party selecting that appraiser." (Id.)

113.    The Appraisal process also requires that "[o]ther expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us." (Id.)

114.    As a result of correctly estimating the "cost to repair or replace" Plaintiffs' damaged property, Plaintiffs were forced to incur additional costs relating to Appraisal of their dwelling damage.

115.    State Farm breached the contract by failing to value and adjust Plaintiffs' partial loss reasonably using "repair/reconstruction pricing" choosing instead to extend coverage as if a total loss occurred and used "new construction" pricing to undervalue and underpay Plaintiffs' claim.

116.    As a result of the breach, Plaintiffs and members of the Sub-Class have been damaged in an amount representing the difference between "repair/replacement of the damaged property" coverage  and "new construction" pricing plus the costs of collection including the expense of the unnecessary Appraisal, legal fees, interest  and consequential damages.

## COUNT IV

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

117.    Plaintiffs repeat and reallege each and every allegation above as if more fully set forth herein.

118.    Plaintiffs bring this claim individually and on behalf of the PA subclass (for purposes of this Count, the" Sub-Class").

119.    The contract(s) which is (are) the subject of the claims herein was (were) made in Pennsylvania and the claims for breach thereof are governed by this state's law.

120.    In Pennsylvania, every contract contains an implied covenant of good faith and fair dealing.

121.    State Farm breached the implied covenant of good faith and fair dealing by deceptively and without good faith basis, failing to value and adjust Plaintiffs' loss reasonably using "repair/reconstruction" pricing choosing instead to improperly use "new home construction" pricing to undervalue and underpay Plaintiffs' claim and by forcing Plaintiffs into a costly and time consuming appraisal process.

122.    As a result of the foregoing, State Farm breached the implied covenant of good faith and fair dealing under Pennsylvania law.

123.    As a result of the breach. Plaintiffs and members of the Sub-Class have been damaged.

## COUNT V

**FOR DECLARATORY JUDGMENT PURSUANT TO THE DECLARATORY JUDGMENT ACT. 42 PA.C.S. SECTIONS 7531-7541 AND/OR RULE 57, FED. R. CIV. P. FOR DECLARATORY JUDGMENT UNDER 28 U.S.C. 2201**

124.    Plaintiffs repeat and reallege each and every allegation above as if more fully set forth herein.

125.    Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

126.    This Count is brought on behalf of the National Class and/or Pennsylvania Subclass (for purposes of this Count, the "Class") under 28 U.S.C. 2201, Rule 37 Fed. R. Civ. P., and/or 42 P.A.C.S. § 75 34:754.

127.    A dispute between Plaintiffs, the Class and Defendant is before this Court concerning the systematic undervaluation of partial loss claims by using inappropriate pricing to calculate the cost to repair and replace the covered damage pursuant to home insurance policies issued by Defendant, and the rights of Plaintiffs and the Class arising under that policy.

128.    Plaintiffs, individually and on behalf of the Class, seek a declaration of rights and liabilities of the parties herein. Specifically, Plaintiffs seek a declaration that in paying non-total- loss claims by first-party insureds, it is a breach of Defendant's insurance contract, as well as a violation of law, for Defendant to base the valuation and payment of claims on "new construction" pricing rather than "repair/remodel" pricing substantially undervaluing the cost of repair and which are contrary to industry practices and consumer experiences.

129.    Defendant's unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendant has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiffs and members of the Class.

## COUNT VI

### FOR VIOLATIONS OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

130.    Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

131.    This Count is brought on behalf of the Pennsylvania Subclass (for purposes of this Count, the " Sub-Class").

132.    Defendant is a "person" as defined by 73 Pa. Cons. Stat.§ 201-2(2).

23

133.     Plaintiffs and the Sub-Class members purchased services in "trade" and "commerce," as defined by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

134.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL"), 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.,* prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

135.     As alleged herein, Defendant, through its agents, employees, and/or subsidiaries, violated the Pennsylvania UTPCPL by knowingly and intentionally concealing and failing to disclose material facts.

136.     By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts, as detailed above, Defendant engaged in one or more  unfair  or deceptive business practices prohibited by the Pennsylvania UTPCPL, including without limitation, advertising goods or services with intent not to sell them as advertised and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

137.     Defendant's misrepresentations and omissions were made to Plaintiffs and the Sub-Class members in a uniform manner.

138.     Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiffs and the Sub-Class members.

139.     The facts that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose (undervaluing partial loss claims by using "new home construction" pricing in lieu of the more expensive "repair/remodel" pricing) would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiffs and the Sub-Class members, who consider such facts to be important to their purchase decisions with respect to Defendant's insurance coverage.

140.     Plaintiffs and Sub-Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiffs and Sub-Class members did not, and could not, unravel Defendant's deception on their own.

141.     Defendant had an ongoing duty to Plaintiffs and the Sub- Class members to refrain from engaging in unfair or deceptive practices under the Pennsylvania UTPCPL in the course of its business. Specifically, Defendant owed Plaintiffs and Sub-Class members a duty to disclose all the material facts concerning its application of an arbitrary use of new home construction pricing in the event of partial losses thus undervaluing the adjustment of the loss because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiffs and the Sub- Class members, and/or it made misrepresentations that were rendered misleading  because they were contradicted by withheld facts.

142.     Plaintiffs and the Sub- Class members were aggrieved by Defendant's violations of the Pennsylvania UTPCPL because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts.

143.     Plaintiffs and the Sub-Class members purchased Defendant's insurance coverage in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts.

144.     Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiffs and Sub-Class members would not have purchased insurance coverage from Defendant or would not have paid as much for it and, thus, they did not receive the benefit of the bargain and/or they suffered out-of-pocket loss.

145.     Defendant's violations of the Pennsylvania UTPCPL present a continuing risk of future harm to Plaintiffs and the Sub-Class members.

146.     Plaintiffs and the Sub-Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the Pennsylvania UTPCPL and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Pennsylvania UTPCPL.

## **PRAYER FOR RELIEF**

WHEREFORE, Jaime Belotti and Becky Belotti demand judgment against Defendant, State Farm on each of their claims as follows: .

A.     Declaring this Action to be a proper class action and naming Plaintiffs as class representatives;

B.     In an amount in excess of $50,000.00, as compensatory damages;

C.     Awarding Plaintiffs the costs and disbursements of this action, including allowance of Plaintiffs' reasonable attorneys' and experts' fees; and

D.     Interest and statutory damages;

E.     Consequential, direct and indirect damages

E.    Such other and further relief this Honorable Court deem necessary and/or appropriate.

Dated: November 1, 2022

Respectfully submitted,

**WILKOFSKY, FRIEDMAN, KAREL &**
 **CUMMINS**

By: /s/ Harry A. Cummins
Harry A. Cummins
299 Broadway, Suite 1700
New York, New York 10007
Phone: (212) 285-0510

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, Harry A. Cummins, hereby certifies that a true and correct copy of the foregoing Second Amended Complaint, was served upon all counsel of record on the 1st day of November, 2022 via electronic filing.

Respectfully submitted,

**WILKOFSKY, FRIEDMAN, KAREL &
 CUMMINS**

By: /s/ Harry A. Cummins
Harry A. Cummins

Attorney for Plaintiffs

28