**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMIE BELOTTI, et al.,**<br><br>                    Plaintiffs,<br><br>          vs.<br><br>**STATE FARM FIRE AND CASUALTY COMPANY,**<br><br>                    Defendant. | CIVIL ACTION NO. 3:22-CV-01284-MEM |

### PLAINTIFFS 'MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SQUITIERI & FEARON, LLP**
Lee Squitieri
305 Broadway
7th Floor
New York, New York 10007
(212) 421-6492
lee@sfclasslaw.com

**WILKOFSKY, FRIEDMAN, KAREL & CUMMINS**
Harry A. Cummins
Roman Rabinovich
299 Broadway, Suite 1700
New York, New York 10007
(212) 285-0510
hcummins@wfkclaw.com
romanlaws@gmail.com

**DURKIN LAW OFFICES, P.C.**
Martin Durkin
1760 Market Street, Suite 601
Philadelphia, Pennsylvania 19103
(215) 569-9090
mdurkin@durkinpc.com

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES……………………………………………………………. iv

INTRODUCTION…………………………………………….…………………… 1

I. STATEMENT OF FACTS…………………….…………………………….……….. 2

  A. State Farm's Course Of Wrongful Conduct Constituting
    Breach Of Express And Implied Contract Terms And
    Violations Of ILCFA and PA Bad Faith Statute Is
    Common To All Class Members.................................................…… ………….. 2

  B.  STATE FARM'S IMPROPER USE OF THE
    NEW CONSTRUCTION LABOR EFFIENCY WAS ROLLED
    OUT NATIONWIDE ACROSS THE STATES AND WITH RESPECT
    TO ALL STATE FARM'S DIFFERENCE HOMEOWNERS POLICY
    FORMS AND WAS APPLIED UNIFORMLY TO ALL LOSSES............................ 3

II. LEGAL ARGUMENT …………………………………………………………..... 9

  POINT I………………………………………………………………………. 9

    A. Standard of Review……………………………………..……………… 9

  POINT II
  STATE FARM BREACHED THE CONTRACT OF
  INSURANCE BY USING THE NEW CONSTRUCTION LABOR
  EFFICENCY SETTING TO ESTIMATE
  CLASS MEMBERS COVERED STRUCTURAL PROPERTY LOSSES...................... 10

    A. Breach Of Express Contract Terms.......................................................... 11

        1. Breach of Coverage A-1 Loss Settlement Terms……………….…….. 11

        2. Breach Of "Repair Or Replace" Terms……………………………..,… 11

    B. Breach Of Implied Contract Terms…….…………………………………….. 13

  POINT III
  PLAINTIFF'S ICFA CLAIM PRESENTS GENIUNE
  ISSUES OF MATERIAL FACT TO BE RESOLVED AT TRIAL................................. 19

POINT IV
BREACH OF STATUTORY GOOD
FAITH OBLIGATIONS UNDER 42 PA. C.S. SECTION 8371....................................... 21


POINT V…………………………………………………………………………… 22

   I. ARGUMENT…………………………………………………………………….. 22

    A. State Farm's Argument That the Plaintiffs' Bad Faith Claim
     Must Fail Because There Is No Breach of Contract Claim
     Is Without Merit…………………………………………………………………… 22

    B. State Farm Acted in Bad Faith by Demanding
     the Submission of a Release and the Discontinuance
     of Suit in Return for the Payment of Supplemental
     First-Party Claim Benefits As Determined By the
     Appraisal Process……………………………………………………………………… 23

    C. State Farm Acted in Bad Faith by Applying the
     Xactimate Definition of "New Construction" Rather
     Than Repair and Remodel in Order to Reduce the
     Amount of the Claim to be Properly Paid to the Plaintiffs……………………….. 25


POINT VI
PLAINTIFFS PRESENT A VALID CLAIM UNDER THE UTPCPL………………….. 27


    A.  The UTPLCPL Applies to the Plaintiffs' Complaint of
      Deceptive Acts by State Farm ……………………………………………………… 27

    B.  Plaintiffs Prove All of the Elements Required Under
      the UTPCPL's "Catch All" Provision…………………………………………... 28

CONCLUSION…………………………………………………………………………… 31

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986)) ......................................................…... 10

*Astenjohnson, Inc. v. Columbia Cas. Co.*,
    562 F.3d 213, 220 (3d Cir. 2009) .............................................. 16

*Avery v. State Farm Mutual Automobile Insurance Company*,
    321 Ill. App. 3d 269 (App. Ct. 5th District 2001) ......................….... 20

*Birth Center v. St. Paul Cos., Inc.*,
    787 A.2d 376, 390 (Pa. 2001) .................................................. 18

*Bitler v. Nationwide Mutual Insurance Company*,
    2001 U.S. Dist. LEXIS 5442 E.D. Pa., March 13, 2001) ......................…. 23

*Bodines, Inc. v. Gordon*,
    113 S. Ct. 303 (1992); ....................................................…....... 21

*Bubis v. Prudential Prop. & Cas. Ins. Co.*,
    718 A.2d 1270, 1272 (Pa. Super. Ct. 1998) ............................... 15, 17

*Burke v. Daughters of the Most Holy Redeemer Inc.*,
    344 Pa. 579, 581, 26 A.2d 460, 461 (1942) .................................14

*Burton v. Teleflex Inc.*,
    707 F.3d 417, 431 (3d Cir. 2013); ........................................... 18

*Butterfield v. Giuntoli*,
    448 Pa. Super. 1, 14 n.8, 670 A.2d 646, 652 n.8 (1995) .................. 17

*Charles D. Stein Revocable Trust v. Gen. Felt Indus., Inc.*,
    749 A.2d 978, 980 (Pa. Super. Ct. 2000) ...........................…... 15

*Commonwealth v. Chesapeake Energy Corp.*,
    247 A.3d 934 (Pa. 2021) ....................................................... 27

*Curbee, Ltd. v. Rhubart*,
    406 Pa. Super. 505, 509, 594 A.2d 733, 735 (1992) .........………… …..…… 15

*D Ambrosio v. Pennsylvania Nat l Mut. Ins.*,
    431 A.2d 966, 970 (Pa. 1981). ............................................. 18

*Donahue v. Federal Exp. Corp.*,
    753 A.2d 238, 242 (Pa. Super. Ct. 2000).................................. 14

*Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.,*
   942 F. Supp. 1018, 1020 (E.D.Pa. 1996). ………………………………………… 22

*Eichelberger v. Warner,*
   290 Pa. Super. 269, 275, 434 A.2d 747, 750 (1981) ……...…………………………… 17

*Fahy v. Nationwide Mut. Fire Ins. Co.,*
   885 F. Supp. 678, 679 (M.D. Pa. 1995) ..………………………………………… 25

*Fay v. UAL Corp.,*
   136 F.R.D. 626, 637 (N.D. Ill. 1991). ……..……………………………………… 21

*Fingles v. Cont'l Cas. Co.,*
   2010 WL 171289, at *3 (E.D. Pa. Apr. 28, 2010) …………………….………………… 18

*Fox v. State Farm Fire and Casualty Company,*
   U.S.D.C. DNJ 20-cv-18131 ……………………………………………………… 13

*Fraser v. Nationwide Mut. Inc. Co.,*
   135 F. Supp. 2d 623 (E.D. Pa. 2001) …………………………………………………... 14

*Gordon v. Boden,*
   586 N.E. 2d 461 (Ill. App. Ct. 1991) …………………………………………… 21

*Hall v. Equifax Info. Servs. LLC,*
   204 F.Supp.3d 807, 810 (E.D. Pa. 2016) ……………………………………… 28

*Hayes v. Harleysville Mut. Ins. Co.,*
   841 A.2d 121, 128 (Pa. Super. 2003).  ……………………………………… 24

*Horowitz v. Federal Kemper Life Assur. Co.,*
   57 F.3d 300, 307 (3d Cir.1995) ……………………………………………… 29

*Kaplan v. Cablevision of Pa., Inc.,*
   488 Pa. Super. 306, 318, 671 A.2d 716, 721-22 (1996) ………………………… 14

*Klinger v. State Farm Mut. Auto. Ins. Co.,*
   115 F.3d 230, 236 (3d Cir. 1997); ……………………………………………… 25

*Lititz Mut. Ins. Co. v. Steely,*
   785 A.2d 975, 982 n.12 (Pa. 2001) …………………………………………… 16

*Macy v. United States,*
   557 F.2d 391 (3d Cir. 1977);. ………………………………………………… 23

*McGourty v. Pennsylvania Millers Mutual Ins. Co.,*
   704 A.2d 663, 664 (Sup. Ct. Pa. 1997) ……………….……………………………… 13

*Mitchell v. State Farm Fire and Casualty Company*,
   327 F.R.D. 552 (N.D. Miss. 2018) ……………………………………………… 12

*Mohn v. American Cas. Co. of Reading*,
   458 Pa. 576, 326 A.2d 346 (1974) …………………………………………… 17

*Nat'l Mfg. Co. v. Citizens Ins. Co. of Am.*,
   No. 13-314, 2016 WL 7491805, at *4 (D.N.J. Dec. 30, 2016) ………………………… 10

*Nealy v. State Farm Mut. Auto. Ins. Co.*,
   695 A.2d 790, 792 (Pa. Super. Ct. 1997) ..…………………………………………… 22

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
   227 F.3d 78, 91-92 (3d Cir. 2000)). ………………………………………..……………… 18

*Nye v. State Farm Mut. Auto. Ins. Co.*,
   No. 3:21-CV-01029, 2022 WL 969620, at *4 (M.D. Pa. Mar. 30, 2022) ……………… 22

*Penn-Air, Inc. v. Indemnity Ins. Co. of N. Amer.*,
   439 Pa. 511,269 A.2d 19 (1970)) …………………………………………………… 17

*People's Benefit Svcs., Inc.*,
   923 A.2d 1230, at 1236 (Pa. 2007). …..……………………………………………… 28

*P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp.*,
   345 Ill. App. 3d 992, 1003 (Ill. App. 2004) …..……………………………………………… 21

*Pratt v. Victoria Ins. Co.*, No.
   10-1629, 2020 WL 4611000, at *1 (E.D. Pa. Nov. 12, 2010) ………………………… 25

*Pressley v. Travelers Prop. Cas. Corp.*,
   817 A.2d 1131, 1140 (Pa. Super. Ct. 2003) ……………………………………………… 15

*Prof'l Inc. v. Mut. Benefit Ins. co.*,
   2020 WL 6743978 at *6 (Pa. Super. Ct. Nov. 17, 2020). ……………………………... 13

*Rancosky v. Washington Nat'l Ins. Co.*,
   170 A.3d 364, 365 (Pa. 2017) ………………………………………………………… 21, 23

*Redevelopment Auth. of Cambria Cty. v. International Ins. Co.*,
   454 Pa. Super. 374, 388, 685 A.2d 581, 588 (1996)…………………………………… 17

*Rudolph v. Pennsylvania Blue Shield*,
   553 Pa. 9, 17, 717 A.2d 508, 511 (1998) ………………………………………………… 17

*Siegel v. Shell Oil Co.*,
   612 F.3d 932, 9334 (7th Cir. 2010). …………………………………… ……………... 19

*Silvis v. Ambit Energy L.P.*,
    2017 WL 75761, at \*3, --- F. App'x --- (3d Cir. Jan. 9, 2017) .............................. 18

*Simon Wrecking Co., Inc. v. AIU Ins. Co.*,
    530 F. Supp. 2d 706, 713-14 (E.D. Pa. 2008) ............................................... 16

*Slapikas v. First Am. Title Ins. Co.*,
    298 F.R.D. 285, 292 [W.D. Pa. 2014] ). ................................................... 28

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    No. CIV.A. 11-7589, 2012 WL 508445, at \*4 (E.D. Pa. Feb. 16, 2012) ............... 29

*Somers*
    613 A.2d at 1213 (citing Restatement (Second) of Contracts, § 205(d)). ...........…..… 14

*Stonehedge Sq. L.P. v. Movie Merchants, Inc.*,
    454 Pa. Super. 468, 480, 685 A.2d 1019, 1025 (1996), *aff'd*, 715 A.2d 1082 ............... 14

*Swoboda v. Travelers Personal Ins. Co.*,
    No. 3:16-cv-00314, 2018 WL 4680131, at \*7 n.4 (M.D. Pa. Sept. 28, 2018)…………... 25

*Swiss Reins. Am. Corp. v. Airport Indus. Park, Inc.*,
    325 Fed. Appx. 59, 65 (3d Cir. 2009)………………………………………………… 16

*Terletsky v. Prudential Property & Cas. Ins. Co.*,
    649 A.2d 680 (Pa. Super. 1994) …………………………….……………………… 21, 23

*Tonkovic v. State Farm Mut. Auto. Ins. Co.*,
    513 Pa. 445, 521 A.2d 920, 926 (1987)) …………………………….……………… 15

*Tubman v. USAA Cas. Ins. Co.*,
    943 F. Supp. 2d 525, 529 (E.D. Pa. 2013) …………………………….……………... 18

*USX Corp. v. Liberty Mut. Ins. Co.*,
    444 F.3d 192, 199 (3d Cir.), …………………………….…………….…………... 16

*Zaloga v. Provident Life and Acc. Ins. Co. of Am.*,
    671 F. Supp. 2d 623, 629 (E.D. Pa. 2009) …………………………….……………… 18

## **RULES AND STATUTES**

2132 Pa. Code §146.4 (a)………………………………………………………… 25

2132 Pa. Code §146.4 (e)………………………………………………………… 23

42 Pa. C.S. § 8371...........…………………………………………………… 21

815 ILCS 505/l(c)..........………………………………………………………… 19

815 ILCS 505/l(e)...........………………………………………………………… 19

815 ILCS 505/l(f) )...........………………………………………………...…… 19

Consumer Protection Law........…………………………………………………… 27

Deceptive Business Practices Act...........……...………………………….………… 19

Illinois Consumer Fraud Act……...........……...………………………….………… 19

PA. CONS. STAT §2202 ……..........……...…….………………………….………… 16

Unfair Trade Practices  ........……...………………………………………...…… 27

Plaintiffs submit this memorandum of law in opposition to Defendants 'Motion For Summary Judgment.

## INTRODUCTION

By repeating almost verbatim its Motion to Dismiss in the instant Rule 56 motion, Defendant has utterly failed to discharge the movant's burden to demonstrate the <u>absence</u> of genuine issues of material fact on any of Plaintiffs 'claims. Accordingly, Plaintiffs are not required to make any factual showing until Defendant discharges its own burden. Nevertheless, Plaintiffs proffer here compelling evidence in support of each claim which far surpasses the level needed to demonstrate genuine issues of material fact.

## STATEMENT OF FACTS

At all times relevant and material hereto, in consideration of a premium paid by the Plaintiffs to the Defendant, to secure A-1 Loss Settlement Provision Coverage Defendant issued and delivered to Plaintiffs an insurance policy, Policy Number 78-BJ-Zl 73-8, wherein Defendant insured Plaintiffs against losses to the property located at 156 Foote Avenue, Duryea, Pennsylvania as more particularly set forth on the Declarations Page of said Policy. *See* Decl. Exh. A, Policy. The aforesaid insurance policy issued to Plaintiffs provided insurance coverage to Plaintiff's premises for the time period encompassing the date of the fire, September 24, 2019. The Policy is a standard form used throughout the United States.

On or about September 24, 2019, during the term the aforesaid policy of insurance was in full force and effect, a fire damage loss occurred at the insured property causing damage to said property but which did not destroy the whole insured structure, nor did State Farm declare it a total loss. *See* Squitieri Decl. Exh. C, Estimate Report of State Farm contractor consultant Ed Geider. Plaintiffs duly notified Defendant of the aforesaid loss and made a proper claim under the Policy.

Mr. Geider forwarded his estimate to State Farm's "claims partner" James McDonnell.

Mr. McDonnell, despite having seen the damaged home for approximately forty five minutes to one hour, nonetheless changed Geida's estimate. McDonnell changed the setting on the Xactimate estimating software from R/S/R LES to NC LES. By switching settings, McDonnell reduced the estimate of the value of Plaintiffs' damage produced an artificially low estimate of $175,451.05, Squitieri Decl. Exh. E, Transcript of Deposition of James McDonnell and Exh. C State Farm estimate.

Plaintiffs' adjuster's estimate for the repair of their damaged home was $374,069.77, using Xactimate's software on the Restoration/Service/ Remodel Labor Efficiency Setting ("R/S/R LES"). Squitieri Decl. Exh. G. This estimate was sent to McDonnell February 2020 (Exh. G).

The disparity in valuations precipitated by State Farm's improper use of the New Construction Labor Efficiency Setting ("NC LES") resulted in a protracted loss adjustment process which took two years to resolve. *See* Exh. H, Evans letter.

On or about September 14, 2022, pursuant to the terms of the policy of insurance with State Farm, the Plaintiffs were forced to cede to State Farm's demand for appraisal despite the extra costs and delay to Plaintiffs. On or about October 14, 2022, pursuant to the terms of the policy of insurance, State Farm nominated its appraiser.  On or about December 23, 2022, pursuant to the terms of the policy of insurance, an umpire was selected by the Plaintiffs' and State Farm's appraisers. State Farm's appraiser estimated Plaintiffs costs to repair or replace was $270,000.00. *See* Squitieri Decl. Exh. I. On or about February 1, 2022, the appraisal process concluded, and an appraisal award rendered (the "Award"). The Award set the dwelling replacement cost benefit at $268,879.70. *See* Squitieri Decl. Exh. J.

      **A.**        **State Farm's Course Of Wrongful Conduct Constituting Breach Of Express And Implied Contract Terms And Violations Of ILCFA and PA Bad Faith Statute Is Common To All Class Members**

State Farm representative Thomas Moss testified that State Farm systematically employs the NC LES structural damage loss estimation method for all losses of over $100,000.00 whether or not the insured's structure has suffered a covered partial loss or total loss. *See* Squitieri Decl. Ex. D, Transcript of the deposition of Thomas Moss. This practice is in violation of (1) the Policy Terms; (2) industry practice; and (3) State Farm's own Operating Guide. *See* Exh. B, State Farm Operation Guide. A partial loss, even huge, does not need to be totally replaced with "new construction." Allowing State Farm to pay only for NC costs for partial losses is nowhere made a term of the policy <u>nor</u> disclosed in the Policy to be a part of any "Loss Settlement" provisions. The inappropriate use of the NC LES versus the R/S/R LES estimate deprives Plaintiff and other class members of the benefit of their coverage. *See* Sq. Exh. K-1, Transcript of the deposition of Plaintiffs 'expert Jeffrey Major.

In defiance of the policy terms to pay for "repair and replacement of "damaged part of the property covered," under the "common construction," A-1 Loss Settlement provisions, State Farm systematically, as a pattern and practice of estimating and paying losses to insureds, uses the Xactimate NC LES estimating model for all losses over $100,000.00 and even which are not total losses. SHUMATE TR  27,L14-17;19-21.

State Farm's Xactimate software program provides State Farm with a choice of LES as follows: Xactimate price lists can show costs based on work in <u>restoration, service, or remodeling</u> environments or based on a new <u>construction</u> environment. Those are the only two settings – the R/S/R setting is the default setting. Exh. D, Moss Dep. at  p. 30, L14-20; State Farm retains the ability and control over the Xactimate system used to estimate losses to allow State Farm to use the NC setting or the R/S/R setting. *See* Exh. D, Moss Dep. At p. 52, L16;

State Farm's "claims partner" (in the Bellotti's claim James McDonnell) used State Farm's Operations Guides to adjust structural damage losses such as Plaintiffs. *See* Squitieri Decl. Exh. B. According to State Farm Operating Guide, NC setting is used in "ground-up" reconstruction or

"portions of large partial losses, which results in a "lower labor cost in many trades." *See* Exh. B. The policy of insurance only references Xactaware as the estimating platform used to "estimate [] the replacement cost of [the] home." (Exh. A, Policy). The definition of "new construction," both as used by Xactimate in its White Paper (*see* Exh. M) and in State Farm's own operating guide (Exh. B), is a building that needs to be rebuilt in its entirety, from the foundation up, resulting from an actual or constructive total loss to the insured's property. Xactimate's pricing methodology summary "offers two options from which to select [labor efficiencies and minimums] in the Estimate Parameters window.

State Farm's use of the NC LES setting for all losses over $100,000.00, has resulted in economic losses to all class members either by underpayment of claims or increased costs in time and money for insured to slog through an appraisal to get State Farm to come up off its low ball NC estimates.

Even where State Farm having persisted in relying on its new construction figures, eventually pays more than the "new construction" estimate, the adjustment process been protracted. The insured to either accept State Farm's low ball NC offer or to initiate litigation or other form of third-party resolution of the dispute at the insureds' own expense.

Moreover, State Farm never discloses to insureds when it sells its property policies or A-1 coverage that:

(i)     State Farm applies the NC LES setting even where its claims file fails to describe a "total loss."

(ii)    State Farm applies the NC LES to the entirety of a "large partial loss" even though its Operating Guide directed State Farm to use the NC LES setting only for "some" "portions" of large partial losses.

The State Farm estimating model has only 2 settings.

Xactimate's estimating software has become industry standard as defined by State Farm's expert Conley. *See* Squitieri Decl. Exh. N, Transcript of Linda Kaiser Conley.

**B. STATE FARM'S IMPROPER USE OF THE
NEW CONSTRUCTION LABOR EFFIENCY WAS ROLLED
OUT NATIONWIDE ACROSS THE STATES AND WITH RESPECT
TO ALL STATE FARM'S DIFFERENCE HOMEOWNERS POLICY
FORMS AND WAS APPLIED UNIFORMLY TO ALL LOSSES**

The evidence makes clear that State Farm toggled the default R/S/R LES setting to NC LES for all losses regardless of whether the loss was a "total loss" as denominated in State Farm's own files. The evidence consists of the "exemplar" claims files produced in discovery by State Farm. (Bates Range). State Farms expert Conley reviewed each and every exemplar file and summarized all 25 in her expert report. *See* Squitieri Decl. Exh. O, Appendices to expert report of Conley. Conley summarizes the exemplar files and that summary reveals that in all the exemplar files State Farm used the NC LES setting despite the fact that only 3 files were of losses that State Farm described as total.

1. The overwhelming majority of State Farm policies insuring structures *i.e.*, homes and other buildings were sold with A-1 Loss Settlement Provisions for which State Farm charged extra premiums but where State Farm only paid losses on the basis of "new construction estimates."

2. State Farm's own Operating Guide admits that use of the NC LES setting always results in lower estimates than the R/S/R LES setting.

3. State Farm's random selections of 25 exemplar files demonstrates that the NC LES setting is <u>always</u> used even for non-total losses.

4. State Farm has admitted that although its OG guide indicates that the NC LES setting may be appropriate for "portions of large partial losses," but State Farm representatives have admitted that when it uses the NC LES setting for "large partial losses" it does not limit such application to "portions" but instead estimates the whole loss using NC LES.

5. The Policy does not make any disclosure of State Farm's Operating Guide guidelines, or its practice of adjusting all large losses using the NC LES setting instead of just applying

5

NC LES to allow "portions of large partial losses" as is the industry standard Xactimate guidance and State Farm's own Operating Guidelines.

<u>The Testimony Of Mark Shumate</u>

Mr. Shumate is a 36 year veteran of State Farm. He is a "claims team manager" and Mr. McDonnell was one of eight "term" members managed by Shumate. Shumate Tr. p. 6, L 1-23. Shumate's duties as claims team manager include supervision of claims adjusters (team members) and he "gets involved in the supervision of files, as well." Shumate Tr. p. 7, L 2-5.

Shumate testified that State Farm's "home office" "estimates team" will provide "training from time to time to the claims operation" which includes, he recalled ". . . we had a meeting as a team where we talked about labor proficiencies [sic] when you should use the, when you shouldn't use them" "it was a couple of years back." Shumate Tr. p. 10, L 12; p. 11, L 16; p. 9.

Team members were trained on estimates. Shumate Tr,. p. 7, L 17-23.

Shumate's supervisor, Michael Canada is responsible for the entire state of Pennsylvania. Shumate Tr. p. 12, L 15 to p. 13, L 11.

Shumate testified that the Xactimate "new construction" labor efficiency "comes into play when you have a large loss claim." Shumate Tr. p. 25, L 2-18. He testified that 'large losses are across the enterprise. It's any claims where you have damage that exceeds $100,000." Shumate Tr. p. 27, L 14-17. That has been the practice since at least 2018. Shumate Tr. p. 27, L 19-21.

Shumate was trained in the various "iterations" of State Farm homeowners policies when he was first hired and thereafter ongoing informal training. Shumate Tr. p. 28, L 18; p. 29, L 7. Shumate described the "A1 Loss Settlement Provisions" coverage purchased by the Bellotti's. Shumate Tr. p. 30-31, L 12. Coverage A1 costs more than coverage A2. Shumate Tr. p. 31, L 21-25. The difference in price, according to Shumate is because "you're paying for similar construction [in A1] versus A2 . . . because your getting common construction." Shumate Tr. p. 31, L 8-18.

Shumate testified that notwithstanding the clear difference in coverage language between A1 and A2, State Farm will use "new construction" cost estimates even when the insured pay the extra premium. Shumate Tr. p. 33, L 1 to p. 34, L 6. Shumate acknowledged that A1 coverage does not have any provision for new construction techniques and materials "as does A2."

Shumate confirmed that he was "trained" that under A1 loss settlement provision "we would have to go by what the operation guide says is it's an actual large loss – over $100,000.

The Testimony of Thomas Edward Moss

Thomas Moss was designated as State Farm's Rule 30b 6 whereas. Moss is a 30-year veteran of State Farm Moss Tr. p. 7, L 15; p.8, L 3. He works out of State Farm's Illinois headquarters. Moss Tr. p. 5, L 12-18. He has "considerable familiarity in working through the existing platform [XACTIMATE] and also understanding the way the tool is used. And I help set the guidance around the way we use the tool with State Farm." Moss Tr. p. 13, L 19; p. 14, L 15. Specifically, he sets the guidance in State Farm's "operations guides" "75-07" Moss Tr. p. 14, L 8-15.

All of State Farm's "Structural Damage Claim Policy" estates use XACTIMATE. Moss Tr. p. 21, L 22; p. 22, L 14.

State Farm sets the XACTIMATE default setting is "restoration services/rewarded" labor efficiency setting because "most of those claims that come in for structural losses will probably have limited damages." Moss Tr. p. 30, L 8; p. 31, L 6. 75-07 "is applicable across all the states and District of Columbia subject to laws and regulations…" Moss Tr. p. 39, L 10-16. 75-07 applies to all losses with a structural component regardless of the covered period, regardless of whether it's a total loss or minor loss, it applies for AZV values or RCV values. Moss Tr. p. 39, L 17; p. 41, L 4.

The claims consultants are all in Bloomington, Illinois who draft the guides and updates to 75-07. Moss Tr. p. 42, L 6; p. 43, L 12.

Geographic area has no bearing on the labor efficiency setting. Moss Tr. p. 50, L 18-24. It does not vary by season (Moss Tr. p. 51, L 13-17) and there is no variable that depends on the type of structure. Moss Tr. p. 52, L 12-17.

XACTIMATE does not provide an option to toggle between labor efficiency settings between line items. Moss Tr. p. 54, L 10-16. The unit price for labor does not change depending on the labor efficiency setting. Moss Tr. p. 59, L 11; p. 60, L 5.

Any "adjustments" made by the claims "partners" at State Farm would "show up in the price list variation usage report," or for additional labor hours it would "show up in the labor and materials report." Moss Tr. p. 70, L8; p. 71, L 7.

<u>The Testimony Of James McDonnell</u>

James McDonnell was deposed on June 22, 2023. He retired as a "claims representative" after thirty-six years at State Farm. *See* Squitieri Decl. Exh E. Transcript of James McDonnell ("McD Tr.") at p. 6, L 4-12. McDonnell was assigned to the Scranton Metro area and Mark Shumate as his "team manager" in and about 2019. McD Tr. p. 8, L 5-7; p. 9, L 1-18. McDonnell was involved in Belotti's claim and he was the person to recommend to Mark Shumate that appraisal be requested. McD Tr. p. 18, L6; p. 19, L 21.

McDonnell visited the Belotti's insured home after the fire but stayed at the stie only an hour or 45 minutes. McD Tr. p. 26, L 14; p. 27, L 24. He was only at the loss site that one time. McD Tr. p. 29, L 13-19. McDonnell hired Edward Gada as an independent contractor to prepare a billing estimate. McD Tr. p. 28, L 14-23.

McDonnell revised Mr. Gada's estimates, p. 30, L 4-15. McDonnell testified that "Exhibit B" the "Structural Loss Claim Handing" Operations Guide was applicable to the Belotti's claims. McD Tr. p. 30, L 23; p. 32, L 6.

McDonnell cannot recall anything the insured or their representative did that impeded him or prevented him from mailing a claim estimate for the structure. McD Tr. p. 33, L 13; p. 34, L 3.

McDonnell did not recommend that the Bellotti's property be torn down and rebuilt because "they were a lot of parts of the building that were reusable that didn't have to be replaced or removed." McD Tr. p. 34, L 15; p. 35, L 9.

The Bellotti "coverage in general are standard homeowners." McD Tr. p. 36, L 3-23.

McDonnell testified that claims estimating at State Farm is "all done electronically through Xactimate." McD Tr. p. 42, L 7; p. 43, L 14.

The Xactimate labor efficiency settings do not depend on case of loss or policy limits. McD Tr. p. 47, L 13; p. 48, L 2.

McDonnell chose the NC LES because "it was more appropriate for the extent of damage at the Bellotti home" because "the house was not occupied." McD Tr. p. 56, L 24; p. 58, L 3.

McDonnell found Bellotti's public adjuster to be "competent." McD Tr. p. 72, L 12-14.

McDonnell did not do anything to try to understand why State Farm's appraisers 'estimate of damage was $267,000 on an RCV basis when his estimate was about $170,000.00. McD Tr. p. 80, L 13-21.

## II.

## LEGAL ARGUMENT

### POINT I

### STANDARD OF REVIEW

A.    **Standard of Review**

Summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, a district court may not make credibility

determinations or engage in any weighing of evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Nat l Mfg. Co. v. Citizens Ins. Co. of Am.*, No. 13-314, 2016 WL 7491805, at *4 (D.N.J. Dec. 30, 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (Vazquez, J.).

Because Plaintiffs bear the burden of proof at trial, Defendant must demonstrate that there is an absence of evidence to support Plaintiffs 'claims. *See id.* at *5 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Only if Defendant satisfies that initial burden does the burden shifts to Plaintiffs to "designate specific facts showing that there is a genuine issue for trial.'" *Id.* (citing *Anderson*, 477 U.S. at 250) "If reasonable minds could differ as to the import of the evidence . . . summary judgment is not appropriate." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322).

## <u>POINT II</u>

### <u>STATE FARM BREACHED THE CONTRACT OF INSURANCE BY USING THE NEW CONSTRUCTION LABOR EFFICIENCY SETTING TO ESTIMATE CLASS MEMBERS COVERED STRUCTURAL PROPERTY LOSSES</u>

Defendant seeks summary judgment against Plaintiffs 'breach of contract claims on several grounds. First, State Farm contends that it has "no contractual duty to use any particular Xactimate labor efficiency setting when estimating losses." SF Br. at 2-4. That is incorrect in light of the A-1 Loss Statement Provisions (Common Construction) which the Belotti's paid for. Second, State Farm contends it complied with its two step loss settlement provision" to pay "actual cash value" and then when repairs are completed to pay the additional amount actually expended to repair the property. What State Farm describes is the contracts loss settlement process terms which are different from value.

State Farm hides its contract breach behind the appraisal award. SF Br. at 5-7. But the law is clear that State Farm further argues that Plaintiffs are not entitled to any further insurance coverage proceeds because they have not spent any money to repair the insured property. SF Br. at 7-9.

A. **Breach Of Express Contract Terms**

1. **Breach of Coverage A-1 Loss Settlement Terms**

Count III of The SAC alleges a breach of the insurance policy terms of coverage. The Plaintiffs

dwelling at 156 Foote Avenue, Duryea, Pennsylvania was insured to a limit of $243,200 for the

"dwelling." *See* Sq. Decl. Exh. A. The specific provision which Plaintiffs claim was breached are:

> In Belotti's policy Form FP-7955 at page 11 (Exh. A, P 029), "Section
> I – Loss Settlement" Coverage A – Dwelling
> 1. A1 – Replacement Cost Loss Settlement – Similar Construction
>
>    a. We will pay the cost of repair or replacement with similar
>       construction and for the same use on the premises shown in
>       the Declarations, the damaged part of the property covered
>       under Section 1 – coverages, Coverage A – Dwelling, except
>       for wood fences, subject to the following:
>       1. Until actual repair or replacement is completed, we will
>       only pay the actual cash value.

By contrast, on the same page, State Farm describes its "A-2" coverage, not purchased by Plaintiffs

and rejected by most insureds (Shumate at Pages 28-29; 30-30) in almost identical terms except that

the cheaper A-2 coverage provides: 2 A-2 Replacement Cost Loss Settlement – Common Construction

". . . (1) we will pay only for repair or replacement of the damaged part of the property with common

construction techniques and materials commonly used by the building trader in standard construction."

(Emphasis supplied). ID.

2. **Breach Of "Repair Or Replace" Terms**

The policy terms also provide coverage for "cost of repair or replace… the damaged part of the

property." Thus the coverage promise is to pay the "damaged part of the property" where the "damaged

part of the property" is only a part of the insured premises. In such case, the coverage is to pay the cost

to repair and replace the damaged property and plaintiffs contend the policy requires such coverage to

be afforded on a "repair and remodel" basis. Complaint ¶¶ 32-33. Plaintiffs contend the policy coverage

provisions cover Plaintiffs for the "damaged part of the property" for "costs to repair or replace,"

The Policy's definition of "actual cash value" further supports Plaintiffs 'interpretation of the coverage for partial losses. The term "actual cash value" is defined in an endorsement as follows:

> FE-3659 Actual Cash Value Endorsement
>
> The following is added to any provision which uses the term "actual cash value":
>
> Actual cash value means the value of <u>the damaged part of the property at the time of loss</u>, calculated as the estimated cost to repair to replace <u>such property</u>, less a deduction to account for pre-loss depreciation.

[Emphasis supplied].[1]

State Farms' argument that this case is not about a contract breach but only about a method of estimating a loss should be rejected here just as it was in *Mitchell v. State Farm Fire and Casualty Company*, 327 F.R.D. 552 (N.D. Miss. 2018). In *Mitchell*, like this case, involved the Xactimate system settings selected by State Farm. But the Court brushed aside State Farm's mischaracterization and held:

> The issue here is not whether actual cash value payments paid by State Farm were reasonable or sufficient, but rather whether State Farm was entitled to deduct labor depreciation from its insureds in the first place.

While *Mitchell* was deciding a Rule 23 motion, the Court was required to analyze the nature of the contract breach claims. The Court ultimately granted Rule 23(b)(3) certification. *Id.* at 565.

---

[1]     State Farms' argument in its motion for summary judgment that this case is not about a contract breach but only about a method of estimating a loss should be rejected here just as it was in *Mitchell v. State Farm Fire and Casualty Company*, 327 F.R.D. 552 (N.D. Miss. 2018). In *Mitchell*, like this case, involved the Xactimate system settings selected by State Farm. But the Court brushed aside State Farm's mischaracterization and held:

> The issue here is not whether actual cash value payments paid by State Farm were reasonable or sufficient, but rather whether State Farm was entitled to deduct labor depreciation from its insureds in the first place.

While *Mitchell* was deciding a Rule 23 motion, the Court was required to analyze the nature of the contract breach claims. The Court ultimately granted Rule 23(b)(3) certification. *Id.* at 565.

State Farm's final stab at the breach of contract claim is to argue that the claim's alleged Defendants cannot be cured because the "amount of their [plaintiffs'] loss has been established by appraisal . . . and bias any subsequent challenge to the sufficiency of State Farm's payments." Br. at 6.

> In Pennsylvania, "An appraisal is limited to determining the amount of loss with all other issues reserved for settlement by either negotiation or litigation."

*McGourty v. Pennsylvania Millers Mutual Ins. Co.*, 704 A.2d 663, 664 (Sup. Ct. Pa. 1997) "a coverage dispute is not within the scope of an appraisal claim." *Prof l Inc. v. Mut. Benefit Ins. co.*, 2020 WL 6743978 at *6 (Pa. Super. Ct. Nov. 17, 2020).

By denying that Plaintiffs claims here constitute "coverage" claims, State Farm is contradicting the position it took in *Fox v. State Farm Fire and Casualty Company*, U.S.D.C. DNJ 20-cv-18131 where State Farm stated there was a "coverage" dispute when the insured claimed coverage for repairs which State Farm says were not damaged. *See* Opinion in Fox ECF No. 40 page 17 of 26 "State Farm's denial of Plaintiff's demand for appraisal did not result from a disagreement over the cost of a covered item, but rather whether the occurrence caused damage to other areas of the Property . . ."

Here the dispute is also over the extent of covered damage: State Farm by applying a "new construction" cost is asserting that the <u>entire</u> premises was damaged. Plaintiffs on the other hand assert that the "damaged property" is only partial.

### B. <u>Breach Of Implied Contract Terms</u>

Plaintiffs 'claim for breach of the contracts implied covenant of good faith and fair dealing implied provisions is based on Pennsylvania law which implies into every contract an implied covenant of good faith and fair dealing.

State Farm breached the implied covenant of good faith and fair dealing by deceptively and without good faith basis, failing to value and adjust Plaintiffs' loss reasonably using "repair/reconstruction" pricing choosing instead to improperly use "new home construction" pricing to

undervalue and underpay Plaintiffs' claim and by forcing Plaintiffs into a costly and time consuming appraisal process.

The principle that a covenant of good faith is implied in every contract is a well-established axiom of Pennsylvania law. State and federal courts interpreting Pennsylvania law have stated that "[e]very contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in it s performance and its enforcement." *Donahue v. Federal Exp. Corp.*, 753 A.2d 238, 242 (Pa. Super. Ct. 2000) (citation omitted). *See also Fraser v. Nationwide Mut. Inc. Co.*, 135 F. Supp. 2d 623 (E.D. Pa. 2001) ("Under Pennsylvania Law, a covenant of good faith and fair dealing is implied in every contract. The breach of the obligation to act in good faith cannot be precisely defined in all circumstances, however, examples of "bad faith" conduct include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rending of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers*, 613 A.2d at 1213 (citing Restatement (Second) of Contracts, § 205(d)). *Kaplan v. Cablevision of Pa., Inc.*, 488 Pa. Super. 306, 318, 671 A.2d 716, 721-22 (1996).

It is axiomatic that the covenant of good faith does nothing more than fill in those terms of a contract that have not been expressly stated. *See, e.g., Stonehedge Sq. L.P. v. Movie Merchants, Inc.*, 454 Pa. Super. 468, 480, 685 A.2d 1019, 1025 (1996), *aff d*, 715 A.2d 1082 (holding that the implied covenant of good faith cannot vary the express terms of a contract).

Examples of breaches include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failures to cooperate in the other party's performance." *Somers*, 613 A.2d at 1213. The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way. See *Burke v. Daughters of the Most Holy Redeemer Inc*., 344 Pa. 579, 581, 26 A.2d 460, 461 (1942).

Interpretation of an insurance policy is a matter of law to be decided by the court. *Curbee, Ltd. v. Rhubart*, 406 Pa. Super. 505, 509, 594 A.2d 733, 735 (1992). "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Charles D. Stein Revocable Trust v. Gen. Felt Indus., Inc.,* 749 A.2d 978, 980 (Pa. Super. Ct. 2000).

"The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.,* 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998). A court's focus upon the insured's "reasonable expectations" is not limited only to situations in which the insurance contract might be deemed ambiguous. *Pressley v. Travelers Prop. Cas. Corp.,* 817 A.2d 1131, 1140 (Pa. Super. Ct. 2003). In fact, "regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents" insurance transactions with non-commercial insureds are subject to a review of the totality of the underlying circumstances. *Pressley*, 817 A.2d at 1139 (quoting *Tonkovic v. State Farm Mut. Auto. Ins. Co.,* 513 Pa. 445, 521 A.2d 920, 926 (1987)).

State Farm will undoubtedly argue that it is free to use any estimating method under A-1 coverage because of the lack of an express term for the R/S/R LES.

Pennsylvania law clearly allows for consideration of trade usage and custom to interpret that Policy language and determine whether it has a particular meaning within the industry. Indeed, the Pennsylvania Supreme Court has held that trade usage must *always* be considered in interpreting a contract, regardless of whether a phrase is ambiguous. *Sunbeam*, 781 A.2d at 1193 ("In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract."). As the Court explained, "[i]f words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean

in common usage and regardless of whether there appears to be any ambiguity in the words." *Id.*; *see also Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 982 n.12 (Pa. 2001) ("Once such custom or usage is established ..., it will be considered part of the contract, the presumption being that the contracting parties knew of such custom or usage and contracted with reference to it."); *Simon Wrecking Co., Inc. v. AIU Ins. Co.*, 530 F. Supp. 2d 706, 713-14 (E.D. Pa. 2008). In other words, even absent an ambiguity, a court may consider evidence of custom in the industry or usage in the trade. *Swiss Reins. Am. Corp. v. Airport Indus. Park, Inc.*, 325 Fed. Appx. 59, 65 (3d Cir. 2009); *USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 199 (3d Cir.), *cert. denied*, 549 U.S. 888 (2006); see also *Astenjohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 220 (3d Cir. 2009) ("Parol evidence cannot be used to contradict the provisions of such a contract. In determining whether such a contradiction would occur, however, the text of the contract must first be interpreted in light of any evidence of trade usage and the performance of the parties under the contract."); *see also* PA. CONS. STAT §2202 ("Terms . . . which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein . . . may be explained or supplemented . . . (1) by course of performance, course of dealing or usage of trade (section 1303).")

The definition of "new construction," both as used by Xactimate and in the insurance and construction industries at large, is a building that needs to be rebuilt in its entirety, from the foundation up, resulting in an actual or constructive total loss to the insured's property. The definition of "repair and remodel" in the context of an insurance loss, as used by Xactimate and in the insurance and construction industries at large, is a building of which some parts remain serviceable, subject to the rebuilding of the remainder of the property.

The insurance industry standard for the use of the Xactimate program is that partial losses jobs are priced using the program's "repair and remodel" pricing, and total losses are priced using the program's "new construction" database. The repair and remodel pricing would be consistent with the

policy provision to pay the "damaged part of the property." Consistent with the general practice in the insurance industry and in the construction industry, for virtually every construction line item priced by Xactimate, the cost of that item for a repair and remodel is higher than the pricing of the same item for new construction.

But even crediting State Farm's explanation that the policy does not require a specific method of ascertaining a total or partial loss or the valuation thereof, at best only creates an ambiguity. Where a court finds an insurance policy provision ambiguous, "the provision is to be construed in favor of the insured and against the insurer." *Redevelopment Auth. of Cambria Cty. v. International Ins. Co.*, 454 Pa. Super. 374, 388, 685 A.2d 581, 588 (1996). *See also Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 270, 1273 (Pa. Super. Ct. 1998) ("[A]n ambiguity in an insurance contract should be read in favor of the insured.").[2] This can be attributed to the general principle that a contract must be construed against the drafter, as well as the fact that insurance contracts generally are contracts of adhesion. *Rudolph v. Pennsylvania Blue Shield*, 553 Pa. 9, 17, 717 A.2d 508, 511 (1998) (citation omitted). In addition, this approach conforms to Pennsylvania's policy of interpreting insurance coverage clauses "broadly so as to afford the greatest possible protection to the insured." *Eichelberger v. Warner*, 290 Pa. Super. 269, 275, 434 A.2d 747, 750 (1981) (citing *Mohn v. American Cas. Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974), and *Penn-Air, Inc. v. Indemnity Ins. Co. of N. Amer.*, 439 Pa. 511, 269 A.2d 19 (1970)). See also *Butterfield v. Giuntoli*, 448 Pa. Super. 1, 14 n.8, 670 A.2d 646, 652 n.8 (1995) ("[I]f a policy is reasonably susceptible of two interpretations, it must be construed in the insured's favor so as not to defeat, unless clearly necessary, the claim to indemnity which the insured intended to obtain.").

---

[2]     A specific provision  in an insurance policy is deemed ambiguous  "if reasonably intelligent people could differ as to its meaning."  *Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 885 (Pa. Super. Ct. 2000).

"There are two separate "bad faith" claims that an insured can bring against an insurer: a contract claim for breach of the implied contractual duty to act in good faith and with fair dealing and a statutory bad faith tort claim under 42 Pa. Cons. Stat. Ann. Section 8371." *Tubman v. USAA Cas. Ins. Co.*, 943 F. Supp. 2d 525, 529 (E.D. Pa. 2013) (quoting *Birth Center v. St. Paul Cos., Inc.*, 787 A.2d 376, 390 (Pa. 2001) (Nigro, J. concurring). "In Pennsylvania, the common law duty of good faith and fair dealing is implied in every contract," *Tubman*, 943 F. Supp. 2d at 529, and a bad faith claim for breach of that duty sounds in contract and is subsumed within a breach of contract claim. *Burton v. Teleflex Inc.*, 707 F.3d 417, 431 (3d Cir. 2013); *Fingles v. Cont l Cas. Co.*, 2010 WL 171289, at *3 (E.D. Pa. Apr. 28, 2010); *Zaloga v. Provident Life and Acc. Ins. Co. of Am.*, 671 F. Supp. 2d 623, 629 (E.D. Pa. 2009) (claims merge); *Tubman*, 943 F. Supp. 2d at 529 (same). "Consequently, the covenant of good faith [applies] only to the [] performance of duties that specifically arise out of the [parties'] contract." *Silvis v. Ambit Energy L.P.*, 2017 WL 75761, at *3, --- F. App'x --- (3d Cir. Jan. 9, 2017) (citing *Burton*, 707 F.3d at 431, and *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91-92 (3d Cir. 2000)).

The Pennsylvania Supreme Court specifically recognizes a common law bad faith contract claim for an insurer's breach of its contractual duty to act in good faith and fulfil its fiduciary duty to its insured. *Birth Center*, 787 A.2d at 379; *see also Ash*, 932 A.2d at 884 (distinguishing between statutory tort and common law contract action). Pursuant to such a claim, "the insurer is liable for the known and/or foreseeable compensatory damages of its insured that reasonably flow from [its] bad faith." 787 A.2d at 379; *D Ambrosio v. Pennsylvania Nat l Mut. Ins.*, 431 A.2d 966, 970 (Pa. 1981).

# POINT III

## PLAINTIFF'S ICFA CLAIM PRESENTS GENIUNE
## ISSUES OF MATERIAL FACT TO BE RESOLVED AT TRIAL

State Farm seeks summary judgment on Plaintiffs 'ICFA claims because "plaintiffs cannot point to any alleged fraud in Illinois." SF Br. at 14-15. State Farm also contends that IFA is preempted. *Id*. at 15. Finally, State Farm argues that there is no specific allegation of deception and no proof of deception. *Id*. at 15-16. Plaintiffs 'ICFA claims are:

At Count II of the SAC (Dkt. 25) (¶¶ 83-99) Plaintiffs allege, separate and apart from contractual policy breaches, a series of "unfair or deceptive acts and practices." (Complaint ¶ 71). Defendant, Plaintiffs, and the Class members are "persons" within the meaning of 815 ILCS 505/l(c). Plaintiffs and the Class members are "consumers" within the meaning of 815 ILCS 505/l(e). Defendant was and is engaged in "trade" or "commerce" within the meaning of 815 ILCS 505/l(f).

Plaintiffs allege that these actions and practices are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act. SAC 97-99.[3] The Illinois Consumer Fraud Act declares ". . . unlawful" "unfair methods of competition and unfair or deceptive acts or practices. . ." ICFA protects "consumers, borrowers, and businesspersons against fraud, unfair methods of competition and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 9334 (7th Cir. 2010). The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CPA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or

---

[3] "The CFA was intended to afford a broader range of protection than the common law [citations omitted] and to curb fraudulent abuses, while eradicating deceptive and unfair practices . . . "the elements necessary to establish fraud under the CFA are less stringent than elements necessary to establish common law fraud." [citations omitted] *Avery v. State Farm,* 746 N.E. 2d 1242 (2001) Ill. Dec. 194, 213.

omission of such material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

The ICFA is applicable nationwide in light of the evidence adduced to date.[4] Plaintiffs alleges more than "headquarters" allegations as a basis for application of the ICFA. *See* SAC ¶¶ 19, 20, 21, 97. The Policy was signed by State Farms corporate officers <u>in</u> Bloomington, Illinois. (See Sq. Decl. A) which demonstrates that the policy language with its allegedly deceptive language was formulated in Illinois and also that the signing of the contract, an essential act for validity of the insurance contract, took place in Illinois. Two of State Farm witnesses gave testimonial evidence indicating that the alleged wrongful conduct by State Farm originated in Illinois. *See* Sq. Decl. EX D and N. State Farm's policy was in fact signed by Defendant's "Secretary" and "President" *see EX A*. The policy itself states "this Company has caused this policy to be signed by its President and Secretary at Bloomington, Illinois." *Id*. Illinois state courts and federal courts within Illinois have applied the ILCFA on behalf of out of state resident against an Illinois defendant where conduct occurs in Illinois. In *Avery v. State Farm Mutual Automobile Insurance Company*, 321 Ill. App. 3d 269 (App. Ct. 5th District 2001) Fifth District Appellate Court held:

---

The CFA does not limit its application to resident consumers. To deny an out-of-state plaintiff a remedy against a resident of Illinois would violate the legislative directive that the CFA be liberally construed to achieve its remedial purposes. Non Illinois consumers have been permitted to pursue an action under the CFA against a resident defendant where the deceptive acts and practices were perpetrated in Illinois."[4] *Avery supra* at 281 citing the Illinois Supreme Court in *Martin v. Heinbold Commodities, Inc.*, 117 Ill. 2d 67, 83, 109 Ill. Dec. 772, 510 N.E. 2d 840, 847 (1987). On appeal to the Illinois Supreme Court, *Avery v. State Farm*, 216 Ill. 2d 100, 296 Ill. Dec. 448, 835 N.E. 2d 801, (2005) the Illinois Supreme Court affirmed in part and reversal in part but agreed with the Appellate Court's recitation of the law:

> We agree with the appellate court that the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining "[whether ICFA] should be applied."

Prima facie, a nationwide class of insureds or a multi-state class can be certified. "A multi-state class action based on the Consumer Fraud Act is not a novelty in Illinois" *P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp.*, 345 Ill. App. 3d 992, 1003 (Ill. App. 2004) citing *Gordon v. Boden*, 586 N.E. 2d 461 (Ill. App. Ct. 1991) appeal denied (591 N.E. 2nd 21 (Ill. 1992), *cert denied*, *Bodines, Inc. v. Gordon*, 113 S. Ct. 303 (1992); *Fay v. UAL Corp.*, 136 F.R.D. 626, 637 (N.D. Ill. 1991).

## POINT IV

### BREACH OF STATUTORY GOOD
### FAITH OBLIGATIONS UNDER 42 PA. C.S. SECTION 8371

The Pennsylvania Legislature enacted Pennsylvania's bad faith statute, 42 Pa. C.S. § 8371 to address circumstances where an insurer fails to act in good faith in response to an insurance claim.

The Pennsylvania Supreme Court has held that, "in order to recover in a bad faith action, the Plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.,* 170 A.3d 364, 365 (Pa. 2017) (adopting test first articulated in *Terletsky v. Prudential Property & Cas. Ins. Co.,* 649 A.2d 680 (Pa. Super. 1994)). Further, "proof of an insurer's motive of self-interest or ill-will, while potentially probative of the second prong, is not a mandatory prerequisite to bad faith recovery under Section 8371." *Id.* at 377.

State Farm's only argument in support of dismissal of this claim is that it is subsumed by "[plaintiffs'] breach of contract claims" and is based on "the same alleged misconduct, State Farm's use of the new construction setting in its estimate." SF Br. at 17. Pennsylvania law disagrees.

## POINT V

I. **ARGUMENT**

A. **State Farm's Argument That the Plaintiffs' Bad Faith Claim Must Fail Because There Is No Breach of Contract Claim Is Without Merit**

In its Brief, the Defendant argues that the Plaintiffs cannot establish bad faith because there is no predicate cause of action to support a claim. The Pennsylvania Superior Court has held that claims brought under Pennsylvania's bad faith statute are "distinct from the underlying contractual insurance claims from which the dispute arose." *Nealy v. State Farm Mut. Auto. Ins. Co.*, 695 A.2d 790, 792 (Pa. Super. Ct. 1997). The Court held that the §8371 claim is "an independent cause of action to an insured that is not dependent upon success or the merits, or trial at all, of the contract claim." *Nealy* at 793. A Federal District Court Judge also held that an insurance claim for bad faith is "independent of the resolution of the underlying contract claim". *Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*, 942 F. Supp. 1018, 1020 (E.D.Pa. 1996).

The Defendant argues here that the Plaintiffs cannot sue in bad faith because they cannot prove that State Farm breached the policy. State Farm cites *Nye v. State Farm Mut. Auto. Ins. Co.*, No. 3:21-CV-01029, 2022 WL 969620, at *4 (M.D. Pa. Mar. 30, 2022) in support of its contention. However, in *Nye* the contract claim, which was considered the predicate cause of action required to accompany the bad faith claim was dismissed. In this matter, the Plaintiffs are prosecuting robust contractual claims related to the damages caused to them by the Defendant's breach with respect to the underpayment of the claim, expenses associated with the appraisal process, and the Defendant's manipulation of the Xactimate estimating application.

Given that the Plaintiffs 'contractual claims remain viable, their bad faith claims cannot be dismissed. Moreover, the Defendant's manipulation of the Xactimate system, which is the central component of the claims set forth in Plaintiffs 'Complaint, standing alone constitutes a predicate cause of action.

**B.** <u>State Farm Acted in Bad Faith by Demanding the Submission of a Release and the Discontinuance of Suit in Return for the Payment of Supplemental First-Party Claim Benefits As Determined By the Appraisal Process</u>

In 1990, the Pennsylvania legislature enacted legislation providing insureds a private cause of action for bad faith against insurance companies. 42 Pa C.S. Section 8371. The legislation states that if a Court finds that an insurer acted in bad faith, the Court may award interest on the amount of the claim, assess punitive damages, and/or assess Court costs and attorney's fees against the insurer.

The Pennsylvania Supreme Court has held that, "in order to recover in a bad faith action, the Plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017) (adopting test first articulated in *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. 1994)). Further, "proof of an insurer's motive of self-interest or ill-will, while potentially probative of the second prong, is not a mandatory prerequisite to bad faith recovery under Section 8371." Id. at 377.

A Release is the relinquishment, concession, or giving up of a right, claim or privilege, by the person in whom it exists or to whom it accrues, to the person against whom it might have been demanded or enforced. *Macy v. United States*, 557 F.2d 391 (3d Cir. 1977); *Bitler v. Nationwide Mutual Insurance Company*, 2001 U.S. Dist. LEXIS 5442 E.D. Pa., March 13, 2001).

Regulations promulgated under the Pennsylvania Unfair Insurance Practices Act provide that an insurer may not request a first party claimant to sign a Release that goes beyond the subject matter giving rise to the claim payment. 2132 Pa. Code §146.4 (e).

Here, the parties proceeded with an Appraisal as there was a dispute concerning the amount of the claim. The Plaintiffs were compelled to file suit as the appraisal process extended beyond the one-year time period contained in the policy in which suit must be filed, known as the suit limitation clause. This clause is statutorily mandated in the Commonwealth of Pennsylvania and the Plaintiffs would

have no right of redress with respect to any contractual claims after the one-year period if they had not filed a Writ of Summons.

Apparently, the Defendant retained the services of counsel who, upon the completion of the appraisal process, sent a letter to Plaintiffs 'public adjuster confirming "State Farm's understanding that upon payment of the Appraisal Award, the Luzerne County Writ of Summons will be dismissed and the enclosed General Release will be signed and returned to our office to finalize the claim."

No such agreement existed between the parties. State Farm, through its counsel, unilaterally required that the lawsuit commenced by the Plaintiffs to toll the suit limitation clause period be dismissed. The Defendant also demanded that the Plaintiffs execute a General Release, which was sent along with the counsel letter in order for the supplemental claim payments, pursuant to the Appraisal Award, to be released. If the Plaintiffs had executed the General Release as demanded by the Defendant, all of their remaining contractual and any extra-contractual claims would have been extinguished, which was obviously the intent of the Defendant.

State Farm acted in bad faith by not only misrepresenting that an agreement existed between the parties which would result in the extinguishment of the Plaintiffs 'remaining contractual claims as well as their right to file suit pursuant to Pennsylvania's bad faith statute, 42 PA. C.S.A. § 8371 and prosecute other claims.

A requirement that a Release be signed for the release of insurance proceeds to be paid may constitute bad faith. *Hayes v. Harleysville Mut. Ins. Co.*, 841 A.2d 121, 128 (Pa. Super. 2003).

Since there were no stipulations attached to the Appraisal and the issuance of the Appraisal Award, State Farm's conduct in retaining counsel, misrepresenting that an agreement existed and demanding that the Plaintiffs discontinue their lawsuit and execute a General Release constitutes bad faith conduct which creates a genuine issue of material fact to be determined by the jury.

The Third Circuit and Pennsylvania Federal District Courts have held that the Seventh Amendment confers a right to a jury trial in bad faith actions in federal court. *Klinger v. State Farm Mut. Auto. Ins. Co*., 115 F.3d 230, 236 (3d Cir. 1997); *Fahy v. Nationwide Mut. Fire Ins. Co*., 885 F. Supp. 678, 679 (M.D. Pa. 1995). *Swoboda v. Travelers Personal Ins. Co*., No. 3:16-cv-00314, 2018 WL 4680131, at *7 n.4 (M.D. Pa. Sept. 28, 2018). See also *Pratt v. Victoria Ins. Co*., No. 10-1629, 2020 WL 4611000, at *1 (E.D. Pa. Nov. 12, 2010).

## C.   State Farm Acted in Bad Faith by Applying the Xactimate Definition of "New Construction" Rather Than Repair and Remodel in Order to Reduce the Amount of the Claim to be Properly Paid to the Plaintiffs

The Plaintiffs incorporate those arguments set forth in other sections of this Brief pertaining to the Defendant's wrongful conduct in applying the Xactimate definition of "new construction" rather than repair and remodel. In its Brief, the Defendant contends that it cannot be found to have acted in bad faith because the amount that the Plaintiffs were shortchanged as a result of its wrongful conduct was only $20,000.00. The Defendant's bad faith conduct cannot be excused because it only attempted to defraud the Plaintiffs of $20,000.00.

The Pennsylvania Unfair Insurance Practices Act Regulations state that an insurer "may not fail to fully disclose to first party claimants pertinent benefits, coverages, or other provisions of an insurance policy or insurance contract under which a claim is presented." 2132 Pa. Code §146.4 (a).

The Defendant had no reasonable basis in which to withhold full payment of the Plaintiffs' building claim. To the contrary, State Farm manipulated its estimating application in order to deliberately low-ball the Plaintiffs' claim. There is more than sufficient evidence to establish that the Defendant did not have a reasonable basis to categorize in Xactimate that the Plaintiffs' loss should be estimated on a new construction basis. A jury will also likely conclude that State Farm knew that it had no reasonable basis and engaged in a concerted course of conduct to pay as little as possible to the

Plaintiffs for their building loss. As such, there is sufficient evidence for a jury to consider whether the Plaintiffs can meet their burden of proof as set forth by the court in *Rancosky,* Id.

**D.   State Farm Acted in Bad Faith by Compelling the Plaintiffs to File Suit**

During the pendency of the Plaintiffs 'claim, the Defendant requested additional time to review the personal property claim with full knowledge that the policy suit provision was set to expire during this timeframe. Inextricably, State Farm refused the Plaintiffs 'representatives reasonable request that it voluntarily toll the policy suit limitation period while the personal property claim, and other aspects of the Plaintiffs 'claim, were under consideration. State Farm refused this request which forced the Plaintiffs to retain counsel and file suit by way of a Writ of Summons. This resulted in unreasonable expense incurred by the Plaintiffs and in litigation that the Plaintiffs never desired at the time.

**E.   State Farm Acted in Bad Faith by Demanding Appraisal When There Was Not Yet a Ripe Disagreement Regarding the Amount of the Loss**

Subsequent to the submission of the Plaintiffs 'claim, the Defendant undertook an inspection and an evaluation of the loss and tendered a settlement offer for the building damages. The Plaintiffs ' representative communicated with State Farm indicating that the offer was substantially undervalued and submitted the Plaintiffs 'itemized claim and other documentation supporting the Plaintiffs ' submission. This information included, but was not limited to, estimates for the demolition and debris removal from the Defendant's recommended vendor, Damage Control. These estimates confirmed that the Defendant substantially undervalued the demolition requirements. In addition, the Plaintiffs ' representative submitted material quotes for property that the Defendant agreed was in need of replacement but had substantially undervalued and also proof of materials used in the home's construction that were incorrectly identified by State Farm with lesser valued property.

Nonetheless, State Farm demanded Appraisal without providing any further evaluation or consideration of payment. The result of the Appraisal established that the claim was substantially low-

balled by the Defendant and was, by any measure, unreasonable. The Appraisal Award also established that the depreciation unilaterally applied to the building estimate by State Farm was exorbitant, unreasonable, and in bad faith.

**POINT VI**

**PLAINTIFFS PRESENT A VALID CLAIM UNDER THE UTPCPL**

**A.  The UTPLCPL Applies to the Plaintiffs' Complaint of Deceptive Acts by State Farm.**

In Point VI of its brief, State Farm seeks summary judgment on Plaintiffs 'Unfair Trade Practices and Consumer Protection Law (UTPCPL) claims because the UTPCPL doesn't apply to the mishandling of insurance claims as alleged in this action. State Farm argues that only improper performance of a contractual obligation (malfeasance), as opposed to nonfeasance, is actionable under the UTPCPL. Thus, State Farm contends, Plaintiffs' claim, which is based on State Farm "undervaluing the adjustment of the loss," is considered nonfeasance and is not actionable. *See* SF R. 56 Brief in Support, pp. 18-19. State Farm misses the point of the UTPCPL, however.

Plaintiffs respectfully submit that the actions taken by State Farm are actionable under the UTPCPL as it was specifically enacted to discourage deceptive acts in the marketplace. *Commonwealth v. Chesapeake Energy Corp.,* 247 A.3d 934 (Pa. 2021) ("The General Assembly enacted the UTPCPL specifically  to eliminate 'the unequal bargaining power of opposing forces in the marketplace 'and "place on more equal terms seller and consumer."). Acts, such as toggling settings in estimating software to intentionally reduce the value of a claim, are precisely the type of action that the UTPCL was enacted to prevent and, therefore, precludes disposition by summary judgment.

The UTPCPL is a consumer protection statute intended to cover a broad range of deceptive practices and should be liberally construed to effect its object of preventing unfair or deceptive

27

practices. *People's Benefit Svcs., Inc., 923 A.2d 1230, at 1236 (Pa. 2007)*.  As such, limiting the UTPCPL to only specific types of insurance claims mishandling is contrary to its broad protective purpose.

**B.   Plaintiffs Prove All of the Elements Required Under the UTPCPL's "Catch All" Provision**

To prosecute a claim under the UTPCPL's catchall provision, a plaintiff must prove: "(1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." *Hall v. Equifax Info. Servs. LLC, 204 F.Supp.3d 807, 810 (E.D. Pa. 2016)* (citing *Slapikas v. First Am. Title Ins. Co., 298 F.R.D. 285, 292 [W.D. Pa. 2014]* ).

State Farm contends that under the UTPCPL's catch-all provision, the Plaintiffs cannot establish either deception by State Farm or detrimental financial harm due to such reliance.

Specifically, State Farm argues that in Pennsylvania only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the UPTCPL and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable. This, State Farm argues, would exclude State Farm's conduct as a deceptive act. See SF R. 56 Brief in Support, pp. 19-20.

Plaintiffs submit that State Farm did more than just refuse to pay. Even though State Farm knew that the Plaintiffs 'home was not going to be torn down and built anew,[5] State Farm intentionally undervalued the Plaintiffs 'claim by knowingly using the wrong labor efficiency pricing (NC LES), thereby, intentionally reducing the value of Plaintiff's claim.  Decl. Exhibit E, Transcript of Deposition of James McDonnell, p.56 and Exhibit C State Farm estimate. This is not

---

[5] *See* SF R. 56 Brief in Support, Exhibit E, McD Tr. P.34:15-22

a mere "failure to pay" but an active wrongdoing or malfeasance which is actionable under the UTPCPL. *Horowitz v. Federal Kemper Life Assur. Co.,* 57 F.3d 300, 307 (3d Cir.1995)

Pertaining to the element of justifiable reliance, the Plaintiffs, having placed their trust in their insurance provider for over a decade and having consistently met their premium obligations, reasonably believed that their claim was being adjusted in a fair and appropriate manner. See Squitieri Certification, Exhibit T, J. Belotti Tr. p. 29:12-15. It is anticipated that that on reply, State Farm will argue that in this case allegations of reliance are implausible with the adjustment of first party insurance claims because such claims "are inherently and unavoidably arm's length and adversarial." Smith v. State Farm Mut. Auto. Ins. Co., No. CIV.A. 11-7589, 2012 WL 508445, at *4 (E.D. Pa. Feb. 16, 2012) (citation omitted), aff'd, 506 F. App'x 133 (3d Cir. 2012). *Smith* is distinguishable from the instant matter and, therefore, inapplicable.

Specifically, in *Smith* the plaintiff accused State Farm of dishonest behavior because it did not explain her coverage properly, gave the wrong value for her claim, did not respond quickly, broke some agreements with her, didn't follow Pennsylvania's rules for insurance companies, and had misleading ads. *Smith*, 2012 WL 508445 at 4-5. The Smith complaint doesn't say if Smith actually believed or acted on State Farm's behavior. In short, the *Smith* court concluded that the plaintiff failed to show how she detrimentally relied.

Here, Plaintiffs pleaded specific wrongful acts in Count II of the SAC (Dkt. 25) (¶¶ 130-146) Specifically, State Farm's misrepresentation of "material facts concerning its application of an arbitrary use of new home construction pricing in the event of partial losses thus undervaluing the adjustment of the loss because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiffs and the Sub- Class members, and/or it made

misrepresentations that were rendered misleading because they were contradicted by withheld facts." (SAC (Dkt. 25) (¶¶ 141).

Ironically, State Farm doesn't seem to dispute the fact that it used the wrong labor efficiency setting in the first place, but rather that the wrongful process was ultimately sanitized by having paid the appraisal award over two years after the date of loss. See SF R. 56 Brief, at 4 ("The undisputed facts demonstrate that Plaintiffs were ultimately paid on the basis of an appraisal award, not State Farm's estimate, and the award was based on an estimate that did not even use Xactimate or its settings.).   State Farm is clearly ignoring the following:

- The Plaintiffs' additional costs associated with an appraisal that could have been obviated had State Farm used the correct labor efficiency setting in its estimate;

- The time and opportunity costs associated with having to wait over two years for the appraisal award; and

- The loss of leverage that Plaintiffs, as ordinary homeowners, had to advance their issues against State Farm due to the impending loss of their coverage for additional living expenses.

State Farm's duty-built approach of low-balling on the initial estimate, by toggling on the NC LES, achieved the dual purpose of either greatly reducing the Plaintiffs 'leverage or facilitating an ill-gotten windfall. Specifically, by deliberately employing an inappropriate labor efficiency metric, State Farm purposefully depressed the preliminary assessment. This action led the Plaintiffs to detrimentally rely on this skewed estimate ensuring that they either conceded to a diminished loss valuation, to the benefit of State Farm, or were subjected to an extended adjustment procedure necessitated by the appraisal process. The appraisal procedure, without dispute, is time-intensive, involving the selection of appraisers, deliberations among them, and the

eventual appointment of an umpire for unresolved matters.[6] As this unfolds, the Additional Living Expense (ALE) period continues to elapse, potentially leaving policyholders, including the Plaintiffs, in a precarious financial position, unable to fund home repairs and bearing the extra expenses of alternative accommodations. In this case, the Policy provided for an ALE "maximum of 24 months."[7] Consequently, confronted with the looming burden of ongoing and uncompensated living costs, the Plaintiffs felt compelled to relocate to a property they had intended for sale. It is unequivocally unjust for the Plaintiffs to have been thrust into a predicament where they had to forego a financial opportunity in order to maintain a roof over their heads just because State Farm elected deceptively game the process by manipulating the labor efficiency settings in the Xactimate estimate. *See* Squitieri Certification, Exhibit T, J. Belotti Tr, p. 124:7-10 ("So, yes, I bought that house [referring to a replacement residence]. I lost out on the profit of selling that house as K-N-B…. because we needed a place to live.").

Despite State Farm's anticipated argument to the contrary, while the claims process may be adversarial, policyholders can nevertheless operate under the presumption that their insurance company will not act in a deceptive manner. This is not a naive trust, but a reasonable expectation anchored in the very premise of insurance and when breached through deceptive practice is fully actionable under the UTPCPL.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny State Farm's motion for summary judgment in its entirety.

---

[6]  See Squitieri Certification, Exhibit A, Policy, p. 33 outlines the appraisal process. See also Evans Affidavit in Support, ¶ 7.

[7]  See Squitieri Certification, Exhibit A, Policy, p. 23 outlines the coverage for Additional Living Expenses.

Dated:  August 31, 2023

Respectfully submitted,

**SQUITIERI & FEARON, LLP**


By:____/s/Lee Squitieri_____
Lee Squitieri
Pro Hac Vice
305 Broadway
7th Floor
New York, New York 10007
(212) 421-6492
lee@sfclasslaw.com

Roman Rabinovich
Harry Cummins
WILKOFSKY, FRIEDMAN, KAREL & CUMMINS
299 Broadway, Suite 1700
New York, NY 10007
(212) 285-0510
romanlaws@gmail.com
hcummins@wfkclaw.com

*Attorneys for Plaintiffs*
*Jamie Belotti and Becky Belotti*