**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMIE BELOTTI and BECKY BELOTTI | : : : | CIVIL ACTION NO. 3:22-cv-01284-MEM |
| Plaintiffs, | : : | (Hon. Judge Malachy E. Mannion) |
| vs. | : : | |
| STATE FARM FIRE AND CASUALTY COMPANY, | : : : | |
| Defendant. | : | |

**STATE FARM FIRE AND CASUALTY COMPANY'S BRIEF**
**IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF**
**<u>PROPOSED EXPERT JEFFREY S. MAJOR</u>**

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

LEGAL STANDARDS ...........................................................................................3

ARGUMENT ..........................................................................................................5

I.  MAJOR'S SUBJECTIVE OPINION REGARDING THE
    APPROPRIATE USE OF NC LES IS PURE *IPSE DIXIT*. .........................5

II.  MAJOR'S INDEMNIFICATION INJURY OPINION IS AN IMPROPER
     LEGAL OPINION. ...........................................................................................11

III.  MAJOR'S DAMAGES METHODOLOGY IS UNRELIABLE AND
      DOES NOT FIT THE FACTS OF THIS CASE. ...........................................13

    A.  Major's So-Called Methodology is Completely Unreliable. ..............13

        1.  Major Wrongly Assumes Payments Are Solely Based on the
            Estimate. ..................................................................................13

        2.  Major Pretends LES Assumptions Are All or Nothing, and
            Ignores Monetary Adjustments Made to Account for Them....14

        3.  Major Ignores the "Cost to Repair" Cap. ..................................15

    B.  Major's Methodology Does Not Fit the Facts of the Case. ...............17

IV.  MAJOR'S SUPPOSED METHOD FOR IDENTIFYING CLASS
     MEMBERS IS NOT ADMINISTRATIVELY WORKABLE. ....................18

V.  MAJOR'S OPINION ABOUT A "COMMERCIAL PRACTICE" IS
    PARROTED HEARSAY. .................................................................................19

CONCLUSION .......................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aronson v. Peoples Nat. Gas Co.*,
   180 F.3d 558 (3d Cir. 1999) ..................................................................20

*Bardo v. Norfolk S. Ry. Co.*,
   459 F. Supp. 3d 618 (M.D. Pa. 2020)....................................................8

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).................................................................................17

*Dalgic v. Misericordia Univ.*,
   No. 3:16-cv-0443, 2019 WL 2867236 (M.D. Pa. July 3, 2019).........20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993).......................................................................*passim*

*Doherty v. Allstate Indem. Co.*,
   No. CV 15-05165, 2017 WL 1283942 (E.D. Pa. Apr. 6, 2017),
   *aff'd*, 734 F. App'x 817 (3d Cir. 2018).................................................11

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...............................................................................10

*In re Anderson*,
   No. 15-21681, 2023 WL 2229355 (Bankr. W.D. Tenn. Jan. 20,
   2023) ........................................................................................................4

*In re Blood Reagents Antitrust Litig.*,
   783 F.3d 183 (3d Cir. 2015) ...................................................................3

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ...................................................................4

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) .....................................................................7

*In re State Farm Fire & Cas. Co.*,
   872 F.3d 567 (8th Cir. 2017) ................................................................12

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
  26 F. Supp.3d 449 (E.D. Pa. 2014) ....................................................10

*Karlo v. Pittsburgh Glass Works, LLC*,
  849 F.3d 61 (3d Cir. 2017) ................................................................5

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2011) .............................................................12

*Legacy Condos., Inc. v. Landmark Am. Ins. Co.*,
  No. 1:06-CV-1108-KS-MTP, 2008 WL 80373 (S.D. Miss. Jan. 4,
  2008) ...............................................................................................15

*Lincoln Fountain Villas Homeowners Ass'n v. State Farm Fire & Cas.
  Ins. Co.*,
  39 Cal. Rptr. 3d 345 (Cal. Ct. App. 2006) ........................................16

*Mahmood v. Narsico*,
  549 F. App'x 99 (3d Cir. 2013) .........................................................4

*Matthews v. State Farm Fire and Cas. Co.*,
  No. 06-4758, 2007 WL 2127581 (E.D. La. July 24, 2007) ................15

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .............................................................3

*Nguyen v. St. Paul Travelers Ins. Co.*,
  No. 06-4130, 2008 WL 4691685 (E.D. La. Oct. 22, 2008) ................12

*Rinker v. Amori*,
  No. CV 3:15-1293, 2016 WL 6879617 (M.D. Pa. Nov. 22, 2016) ......6

*Sikkelee v. Precision Airmotive Corp.*,
  522 F. Supp. 3d 120 (M.D. Pa. 2021) ................................................10

*Stiers v. State Farm Ins.*,
  No. 3:11-cv-437, 2012 WL 2405982 (E.D. Tenn. June 25, 2012) ......15

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
  949 F.3d 825 (3d Cir. 2020) ......................................................*passim*

*Weiner v. Snapple Bev. Corp.*,
  No. 07 Civ. 8742, 2010 WL 3119452 (S.D.N.Y. Aug. 3, 2010) .........19

*ZF Meritor, LLC v. Eaton Corp.,*
   696 F.3d 254 (3d Cir. 2012) ................................................................................10

**Rules**

Fed. R. Civ. P. 23 ...............................................................................................3, 4

Fed. R. Civ. P. 23(a)...............................................................................................3

Fed. R. Civ. P. 23(b) ..............................................................................................3

Fed. R. Evid. 702 ...........................................................................................*passim*

Fed. R. Evid. 703 ..................................................................................................20

## INTRODUCTION

Plaintiffs have proffered public adjuster Jeffrey S. Major ("Major") as their sole expert to attempt to avoid summary judgment on their claims and in support of their class certification motion.  In his Report (Ex. 1 hereto), Major offers essentially five opinions:

1. Xactimate's New Construction labor efficiency setting ("NC LES") supposedly may only be used "[i]n the event of a 'total loss' where the entire building burned down, or when State Farm has concluded an 'economic total loss' and they have paid to demolish the remaining portions of the building leaving only the ground or foundation, … [or] where a wing of a home or building has been completely damaged requiring that entire section to be built from the ground up." (¶ 17)

2. Whenever State Farm used NC LES to estimate "partial repair damage[]," this supposedly results in policyholders "not being indemnified according to the policy coverage."  (¶ 18)

3. To calculate each class member's damages, "[a]ll that needs to be done is to uncheck the new construction box [in State Farm's ACV estimate] which will switch the labor efficiency setting to R/S/R and all the calculations automatically follow."  (¶ 43(a))

4. "Simple and clear parameters" supposedly could be used to identify putative class members.  (¶ 20)

5. State Farm supposedly has "a commercial practice" of "intentionally lowering" claim payments by estimating partially damaged homes using NC LES.  (¶ 18) [1]

---

[1] Plaintiffs rely on the second opinion in opposition to summary judgment [Dkt. 55 p. 3], and they rely on the first, second, and fourth opinions in support of their class certification motion [Dkt. 54-1 pp. 11-13, 24, 41].

None of these opinions remotely satisfies the standards for admissibility of expert opinions in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Major's opinion regarding the appropriate use of NC LES is based solely on his own idiosyncratic view as a public adjuster. It is contradicted by the guidance provided by Xactimate's developer and the testimony of every fact witness, including Plaintiffs and their public adjuster. The opinion is pure *ipse dixit*, which is not allowed under Rule 702.

Major's opinion as to whether class members were properly indemnified is an improper legal opinion, and a wrong one at that. An estimate is not conclusive as to State Farm's payments on a claim. An alleged initial underestimate of some items certainly does not establish a breach of the State Farm's indemnity obligation under the applicable insurance policy.

Major's so-called methodology for establishing class-wide damages is totally unreliable and does not even fit the named Plaintiffs' own claim. The amount of Plaintiffs' loss was set by appraisal pursuant to policy provision and they received replacement cost benefits from State Farm. Major has admitted neither of which is accounted for by his methodology.

Major's methodology for identifying class members is neither reliable nor administratively workable. In his deposition, he acknowledged identifying class

members will require individual assessments of each estimate in each individual claim.

Finally, Major's factual assertion that State Farm has a common practice of improperly selecting NC LES is solely based on hearsay from others (plaintiffs' counsel and other public adjusters he knows). Plaintiffs surely cannot use Major as a conduit to introduce this hearsay.

All of Major's opinions should be excluded in their entirety.

## LEGAL STANDARDS

Federal Rule of Evidence ("FRE") 702 and *Daubert* impose a "gatekeeping obligation" on district courts "to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020). This gatekeeping function applies at the class certification stage: a plaintiff cannot rely on expert testimony "to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015). Expert testimony that does not satisfy *Daubert* cannot "'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *Id.* (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)). Accordingly, when expert testimony is

challenged at class certification, district courts are required to "conduct a *Daubert* inquiry before assessing whether the requirements of Rule 23 have been met." *Id.* at 188.[2]

Under *Daubert,* codified in FRE 702, expert testimony is admissible only if (1) the witness is "qualified" as an expert, (2) the testimony is "reliable and relates to matters requiring scientific, technical, or specialized knowledge," and (3) the testimony is "sufficiently tied to the facts of the case, so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury*, 949 F.3d at 832 (citation omitted). The party offering the expert—here, Plaintiffs—bears the burden of proving each of these requirements by a preponderance of evidence. *Mahmood v. Narsico*, 549 F. App'x 99, 102 (3d Cir. 2013). The 2023 amendments to FRE 702, which will become effective December 1, 2023,[3] emphasize the importance of the court's gate-

---

[2] Notably, admissibility of expert testimony under *Daubert* is a necessary, but not a sufficient, condition for such testimony to support class certification. As the Third Circuit has explained, "[e]xpert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008). "It follows that opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason." *Id.* "Like any evidence, admissible expert opinion may persuade its audience, or it may not." *Id.*

[3] Though not yet in effect, the amendments and the associated Committee Notes are persuasive authority because, as the Committee explains, they are "simply intended to clarify" how Rule 702 should have been applied all along. *In re Anderson*, No. 15-21681, 2023 WL 2229355, at *3 (Bankr. W.D. Tenn. Jan. 20, 2023) (internal quotation omitted).

keeping function, and reiterate that the expert testimony's proponent must prove *each requirement* by a preponderance of the evidence, including that it must be "based on sufficient facts or data," be "the product of reliable principles and methods," and "a reliable application" of those "to the facts of the case." *See* 2023 Amendment, Fed. R. Evid. 702. None of Major's opinions are admissible under these standards.

## ARGUMENT

## I.    MAJOR'S  SUBJECTIVE  OPINION  REGARDING  THE APPROPRIATE USE OF NC LES IS PURE *IPSE DIXIT*.

Rule 702 "requires expert testimony to be 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" *UGI Sunbury*, 949 F.3d at 833-34 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)). As the Third Circuit instructs, a court assessing the reliability of an expert's opinion "looks to whether the expert's testimony is supported by 'good grounds.'" *UGI Sunbury*, 949 F.3d at 834 (internal quotation omitted). Whether "good grounds" support an expert's proffered testimony "depends on many factors," including:

> (1) whether [the expert's] method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert

witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* While no one factor is dispositive, "some analysis of these factors is necessary."

*Id.* Also, "[t]he Third Circuit has made clear that 'the reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" *Rinker v. Amori*, No. CV 3:15-1293, 2016 WL 6879617, at *15 (M.D. Pa. Nov. 22, 2016) (citation omitted) (alterations in the original).

The Third Circuit's discussion of this framework in *UGI Sunbury* is informative. In that case, plaintiffs' expert Don Paul Shearer offered an opinion, based on his "damaged goods theory," regarding the effect of permanent easements for a gas pipeline on the value of plaintiffs' properties. 949 F.3d at 830. The Third Circuit found that Shearer's proposed testimony lacked both the reliability and fit required under Rule 702, and that the district court had abused its discretion in denying the defendant's motion to exclude the testimony. *Id.* at 833. With respect to reliability, the court emphasized Shearer's failure to make any showing that the eight factors identified above demonstrated there were "good grounds" to support his opinion. As the court explained, Shearer's reports:

lack any suggestion that the "damaged goods theory" has been subject to peer review or enjoys general acceptance. Nor do they contain any analysis of a known or potential rate of error. Or any standards controlling the theory's application.

6

*Id.* at 834.   The court concluded that the "speculative and subjective nature" of Shearer's testimony "sever[ed] the necessary relationship to 'methods which have been established to be reliable.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994)).

Major's opinion concerning the proper use of the NC setting is even more profoundly flawed than the opinions the Third Circuit found deficient in *UGI Sunbury*.  Plaintiffs rely on Major for the proposition that: "The insurance industry standard for the use of the Xactimate program is that partial losses are priced using the program's R/S/R 'repair and remodel' pricing, and total losses are priced using the program's NC labor efficiency settings," [Dkt. 54-1 p. 13 (citing Major Dep.)]. However, plaintiffs fail to disclose his concession that NC LES is also appropriate where a "section or wing" of "a home or building has been completely  damaged" (Ex. 1 ¶ 17) which essentially concedes NC LES is appropriate for some partial losses.[4]

More to the point, just as in *UGI Sunbury,* Major cites no testing or studies supporting his opinion that NC LES can only be used in these limited circumstances.

---

[4] Major acknowledges he has never prepared multiple estimates for the same home and there is "no mechanism" for doing so in Xactimate.  *See* Major Dep., attached as Ex. 2, pp. 79:8-79:24, 82:11-16.

*See also Bardo v. Norfolk S. Ry. Co.*, 459 F. Supp. 3d 618, 625-26 (M.D. Pa. 2020) (excluding expert opinion that was not tested or supported by any studies). Major did not review ***any*** of the 25 sample claim files produced by State Farm, so he cannot say whether NC LES was properly used in any of them. *See* Major Dep., attached as Ex. 2, pp. 112:14-24.[5]

Major also fails to demonstrate that his approach is generally accepted in the industry, much less does he cite to any authoritative text supporting the approach he concocted. In fact, his approach is *contrary to* the guidance provided by Xactimate's developer, Verisk. His report cites parts of one Verisk White Paper (¶¶ 21, 41), while ignoring other White Papers stating "portions of a large partial loss" can be addressed using NC LES. *See* [Dkt. 24-4 p. 4]; Kahlon Decl. [Dkt. 45-1] Ex. 7 (filed under seal) ("Berryman Report") pp. 13-14.

Major's assertion is also contradicted by the testimony of named Plaintiff Jamie Belotti (himself a contractor) and Plaintiffs' own public adjuster Brian Evans. Belotti agreed NC LES can be used for portions of large partial losses and the determination of when it is appropriate is up to the judgment of the estimator. [Dkt. 66-5] J. Belotti Dep. pp. 63:13-20, 108:18-109:2.

---

[5] In contrast, both Ms. Conley and Mr. Berryman reviewed those files and concluded that the files did not support Mr. Major's narrow view of the circumstances in which NC LES may be appropriate. [Dkt. 45-1] Berryman Rep. pp. 65-66; [Dkt. 45-1] Conley Rep. pp. 44-45.

Plaintiffs' own public adjuster testified similarly. *Id.,* [Dkt. 66-7] B. Evans Dep. pp. 117:19-24, 141:2-15 ("It's up to the estimator."). He explained how this determination must be made on a "case-by-case" basis after a physical inspection:

> Q. [S]o there are … certain partial losses when you get to a certain phase that the new construction setting will be appropriate for. Do you agree with that?
>
> A. Yes.
>
> ***
> Q. … And that, then, depends upon the circumstances of the partial loss and the damage that it has caused to the structure?
>
> A. ***Case-by-case basis.***
>
> ***
> Q. And what you are saying there is that … there are certain large partial losses where certain elements of the repair on a case-by-case basis may be appropriate for the new construction setting, correct?
>
> A. Potentially, yes.
>
> Q. And … how would you go about identifying those circumstances? Would it require physical inspection of the necessary repairs?
>
> A. ***Definitely.***

*Id.* pp. 88:15-21, 89:23-90:3, 119:7-18 (emphasis added).

This testimony directly contradicts Major's unsupported assertion of an industry standard categorically limiting the use of NC LES. When confronted regarding this testimony, Major testified that any testimony by Plaintiff Belotti or his public adjuster was somehow "moot to the matter." Ex. 2 p. 19:7-12. That make no sense, and the fact Jaime Belotti and public adjuster Evans disagree with the

supposed industry standard Major concocted renders his opinion unreliable.  *See ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 291 (3d Cir. 2012) ("When an expert opinion is not supported by sufficient facts to validate it …, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.") (citation omitted); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp.3d 449, 460-61, n. 39 (E.D. Pa. 2014) (expert report that "fails to account adequately for contrary evidence … is not reliable").

At his deposition, Major struggled to articulate any basis for his view.  He ultimately conceded it is based just on his own say-so:

> Q.    [W]hat is the basis for your opinion that Xactimate's new construction labor efficiency setting is -- can only be used with ground-up projects?
>
> A.   I don't have any answer, other than the fact of it's the efficiency. It's the labor efficiency.

Ex. 2 p. 170:13-20; *see also id.* pp. 185:22-189:23, 190:6-192:14.

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Sikkelee v. Precision Airmotive Corp.*, 522 F. Supp. 3d 120, 158 (M.D. Pa. 2021) ("[A]n expert's say-so does not satisfy *Daubert* on its own.").  This Court should reject Mr. Major's *ipse dixit* assertion that NC LES cannot be used for large partial losses.

## II.    MAJOR'S  INDEMNIFICATION  INJURY  OPINION  IS  AN IMPROPER LEGAL OPINION.

Major offers the legal opinion that whenever State Farm uses NC LES to estimate a partial loss, it results in insureds "not being indemnified according to the policy coverage."  Ex. 1 ¶ 18.  Plaintiffs rely on this opinion to try and establish class-wide injury: "The inappropriate use of the NC LES versus the R/S/R LES estimate deprives Plaintiff and other class members of the benefit of their coverage." [Dkt. 54-1 pp. 11-12 (citing Major Dep.).]

It is well-settled that experts cannot offer opinions about coverage.  *Doherty v. Allstate Indem. Co.*, No. CV 15-05165, 2017 WL 1283942, at \*21 (E.D. Pa. Apr. 6, 2017) ("[C]overage is a legal question reserved for the court.") (collecting cases), *aff'd*, 734 F. App'x 817 (3d Cir. 2018).  Major's legal opinion that insureds were not properly indemnified according to their coverages should be excluded.

Major is not a lawyer.  *See* Major CV, attached as Ex. 3.  Not only is it improper for him to offer a legal opinion as to coverage, but he plainly is not competent to do so, and his legal conclusion is wrong in any event.  An alleged error in an estimate simply does not breach an insurer's duty to indemnify.[6]  Insurance "entails a promise to *pay* covered losses, not a covenant to use a particular standard

---

[6] Major admitted an estimate may underestimate some items while overestimating others; what matters is the sufficiency of the overall amount to cover the anticipated cost of repairs.  Ex. 2 p. 140:2:22.

for *evaluating* property damage." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 890 (7th Cir. 2011) (emphasis added). Plaintiffs admit their Policy does not require any "specific method of estimation." [Dkt. 25 ¶ 25.]

If State Farm "fully compensated" a policyholder's ACV, then State Farm "will have satisfied its contractual obligation" *regardless* of how it initially estimated ACV. *Kartman*, 634 F.3d at 890. *See also In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 577 (8th Cir. 2017) ("[A]lthough we do not rule out the possibility that State Farm's use of the Xactimate estimating methodology would produce an unreasonable estimate of the actual cash value of some partial losses, this issue may only be determined based on all the facts surrounding a particular insured's partial loss."); *Nguyen v. St. Paul Travelers Ins. Co.,* No. 06-4130, 2008 WL 4691685, at *5 (E.D. La. Oct. 22, 2008) ("[F]or each class member, the issue is whether the *total amount* paid, not just a discrete, uniformly applicable component of that payment, was sufficient to satisfy [the insurer's] contractual obligation.") (emphasis added). Plaintiffs and their public adjuster agree that what matters is the sufficiency of State Farm's "total" ACV payments, not its initial estimate or a "discrete" component in that estimate. [Dkt. 66-5] J. Belotti Dep. Tr. pp. 33:6-10, 33:15-19, [Dkt. 66-7] B. Evans Dep. Tr. p. 93:11-22. Thus, even if it were proper for Major to offer a legal opinion, which it decidedly is not, his legal conclusion is wrong.

## III.  MAJOR'S DAMAGES METHODOLOGY IS UNRELIABLE AND DOES NOT FIT THE FACTS OF THIS CASE.

### A.  Major's So-Called Methodology is Completely Unreliable.

After incorrectly concluding that every policyholder with a partial loss was injured by the estimate's use of NC LES, Major opines that to calculate their damages, "[a]ll that needs to be done is to uncheck the new construction box [in State Farm's ACV estimate] which will switch the labor efficiency setting to R/S/R and all the calculations automatically follow."  Ex. 1 ¶ 43(a).  This methodology is entirely unreliable in myriad respects: (1) it wrongly assumes that State Farm's initial ACV estimate was the sole basis for payment (there are often supplemental estimates issued, often the amount payable is agreed to between State Farm and the insureds or their representatives through reconciliation of estimates, and often the amount of loss is set pursuant to the policy provision of appraisal); (2) it fails to account for any monetary adjustments State Farm already may have made to account for the choice of LES; and (3) it ignores entirely the policyholders' actual repair costs.

### 1.  Major Wrongly Assumes Payments Are Solely Based on the Estimate.

Major's methodology fails to account for the fact that a particular estimate may not have been the sole basis for the amounts paid by State Farm.  State Farm may have subsequently agreed with the insured or its contractor on the amount of payments with or without updating its estimate.  *See* [Dkt. 45-1] Ex. 8 ("Conley

Report") p. 51.  Plaintiffs themselves illustrate this: their loss amount and their ACV payment were determined on the basis of an agreed appraisal award, pursuant to the policy, not State Farm's initial estimate.  *See* [Dkt. 55-2 ¶ 48].  The 25 sample claim files produced by State Farm illustrate other examples of payments on agreed-upon amounts.  *See* [Dkt. 45-1] Conley Rep. pp. 64-65, 77-78; [Dkt. 45-1] Berryman Rep. pp. 34-63.  Major's methodology doesn't address any of these real-world facts.

> 2. *Major Pretends LES Assumptions Are All or Nothing, and Ignores Monetary Adjustments Made to Account for Them.*

By calculating damages as simply the difference between NC LES and RSR LES, Major ignores that these settings are based on sets of *assumptions,* which he himself admits may or may not apply in a particular loss.  *See* Ex. 2 pp. 328:5-329:25.  As Berryman explains, "these are only two (2) loci that represent good starting points, and they cannot begin to address all the variables that must be considered as the estimator goes about the task of using good judgment and experience to decide the appropriate LES, labor hours and unit pricing for a particular repair job." [Dkt. 45-1] Berryman Rep. p. 18.  For this reason, Xactimate's developer "recommends making adjustments" when "the actual job conditions don't match the assumptions." *Id.*

This again is illustrated by Plaintiffs' claim, where dozens of additional labor hours were included in their estimate to account for tying repairs into the preexisting structure.  *See* Dkt. 47-2 p. SFBELOTTI00071 (11/22/19 file note); [Dkt. 45-1]

14

Berryman Rep. pp. 18-19, 63.  It is illustrated again by other examples in the sample claim files of State Farm adding labor hours.  *See* [Dkt. 45-1] Berryman Rep. pp. 40, 47-48, 50, 52-53, 56-57.  Major's methodology again altogether fails to account for these real-world facts.  It would lead to policyholders being compensated twice for the same labor assumptions.  *See* [Dkt. 45-1] Conley Rep. p. 50 ("The result would be a recalculation that includes both the added labor hours and the lower labor productivity rate (increased cost) associated with the selection of the restoration/service/remodel labor efficiency setting.").

### 3. *Major Ignores the "Cost to Repair" Cap.*

The Policy loss settlement provision limits State Farm's indemnity obligation to "the cost to repair or replace … the damaged part of the property."  Policy [Dkt. 54-3] p. P029.  This means that "[e]ven if there is some dispute with the amount of the ACV payment," "the actual costs of repair cap the insurer's obligation."  *Stiers v. State Farm Ins.*, No. 3:11-cv-437, 2012 WL 2405982, at *4 (E.D. Tenn. June 25, 2012); *Matthews v. State Farm Fire and Cas. Co.*, No. 06-4758, 2007 WL 2127581, at *2 (E.D. La. July 24, 2007) ("the amount plaintiffs[] spent to repair their home" dictates "the amount, if any, that defendant may owe to plaintiffs"); *see also Legacy Condos., Inc. v. Landmark Am. Ins. Co.*, No. 1:06-CV-1108-KS-MTP, 2008 WL

80373, *3 (S.D. Miss. Jan. 4, 2008) ("repairs actually made render estimates for those same repairs irrelevant").[7]

State Farm fully paid the equivalent of Plaintiffs' actual repair costs in the form of the purchase price for a new home.[8] [Dkt. 55-2 ¶¶ 67-73.] The sample claim files contain examples of insureds completing repairs within the amount of State Farm's ACV payments (based on the use of NC LES). [Dkt. 45-1] Berryman Rep. pp. 65-66 ("Those losses show that often the policyholder's Contractor-of-Choice (COC) completed the restoration of a 'partial' loss for an estimate total formulated with Xactimate's NC setting."). Major has no idea how to account for these scenarios:

> Q. So if State Farm has already paid a class member for … the full cost of their repairs -- … are you testifying that [] that class member nonetheless would be entitled to an additional payment based upon your methodology in your report?
>
> A. I'd have to give that a little more thought.

Ex. 2 p. 248:9-23. These admitted glaring gaps in Major's methodology are fatal to its reliability.

---

[7] *Accord Lincoln Fountain Villas Homeowners Ass'n v. State Farm Fire & Cas. Ins. Co.*, 39 Cal. Rptr. 3d 345, 354 (Cal. Ct. App. 2006) (alleged ACV underpayment moot where insured completed repairs within ACV payment).

[8] Plaintiffs never solicited any repair estimates or attempted to repair their damaged home, but instead sold it "as is." [Dkt. 45-1] J. Belotti Dep. Tr. pp. 98:23-99:9, 100:2-7, 147:24- 148:7, 148:18-21; Pls. Resp. to SOF [Dkt. 55-2] ¶ 66.

### B.    Major's Methodology Does Not Fit the Facts of the Case.

Major's methodology similarly fails to satisfy Rule 702's independent requirement of "fit" to the facts of the case. *Daubert*, 509 U.S. at 591. It necessarily fails because it is not "consistent with [Plaintiffs'] liability case." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Major conceded he has not accounted for the receipt of replacement cost benefits by Plaintiffs or other class members, Ex. 2 p. 248:9-23, or for instances where appraisals occurred. *Id.* p. 34:13-17. At his deposition, Major initially failed to grasp the importance of appraisals to his methodology, saying they're "two completely different things." Ex. 2 p. 22:13-19. Then he backtracked and said his methodology could be used to calculate the Plaintiffs' damages "[b]efore they went to appraisal" but "[p]ost-appraisal, that's what the award is." *Id.* pp. 29:20-24, 33:24-34:17.

Then Major invented a new opinion on the spot in his deposition, that if his methodology yielded a higher number than the appraisal award, the class member would be entitled to the delta. *Id.* p. 36:7-12. When confronted with the fact that Plaintiffs received more through appraisal (over $60,000) than they would have received through his methodology (approximately $20,000), Major invented another theory, that "if we went back and forensically analyzed the award and how they obtained it," then it could theoretically "could have concluded a higher number." *Id.*

pp. 47:14-48:11.  But he conceded he has not conducted that "forensic analysis," and so cannot say whether it would have resulted in any more money for Plaintiffs, *id.* p. 48:12-14 , or for other class members who went through appraisal.  *Id.* pp. 52:17-53:3.  Since Major's proffered damages methodology does not even work for the named Plaintiffs, much less for similar class members, it does not fit this case.

## IV.    MAJOR'S SUPPOSED METHOD FOR IDENTIFYING CLASS MEMBERS IS NOT ADMINISTRATIVELY WORKABLE.

Major cryptically asserts that "[s]imple and clear parameters could be set to identify the class or any sub-class which would make a member eligible for the re-calculation" (Ex. 1 ¶ 20), but he is careful to say there is no exhaustive list, and thus cannot offer objectively ascertainable criteria.  *See id.* ¶ 42(h) ("[t]hese items … are just some of the many indicators").  Major testified that to accurately identify class members, someone must look at each individual estimate and apply their judgment to assess whether NC LES was appropriate for the estimate in that claim for that particular loss, which State Farm would then have an opportunity to dispute on a claim-by-claim basis.  Ex. 2 pp. 255:2-257:4, 282:7-284:25.  That is an infeasible method for identifying class members, and would shift the burden to State Farm to *disprove* class membership.

Recognizing its infeasibility, Plaintiffs try to recraft Major's opinion, claiming the "objective criteria" for class membership is whether a class member had a partial

loss and State Farm used NC LES in their estimate.[9]  That is not what their expert believes: Major acknowledges that NC LES may be used for partial losses where a wing or portion of a home was completely destroyed, which may require manually looking at pictures or sketches of the loss to determine.  Ex. 2 pp. 295:2-297:6.  Even to assess whether a loss is "partial," Major acknowledges this would require examining each "estimate and file," Ex. 1 ¶ 42(a), because there is no electronic field that can be searched to make that determination.  Moss Decl. [Dkt. 61-4] ¶ 9.  There is no way to test this subjective method for identifying class members, rendering it unworkable and unreliable.  *See Weiner v. Snapple Bev. Corp.*, No. 07 Civ. 8742, 2010 WL 3119452 , at *9 (S.D.N.Y. Aug. 3, 2010) (excluding expert methodology because expert failed to show "his methodology will, in fact, be workable in this case").

## V.  MAJOR'S OPINION ABOUT A "COMMERCIAL PRACTICE" IS PARROTED HEARSAY.

Finally, Major steps entirely outside his proposed expert role to make the factual assertion that State Farm "as a commercial practice" supposedly improperly selects NC LES for partial losses, thereby "intentionally lowering the claim payment."  Ex. 1 ¶ 18.  He asserts that at some point, State Farm "deployed the

---

[9] In their class certification brief, Plaintiffs refer to an "accompanying Declaration of Jeffrey Major (Exh. C)" supposedly establishing "it is administratively feasible to identify Class members" [Dkt. 54-1], but no Declaration is attached as Exhibit C.  Exhibit C is a draft estimate.

stratagem of underpaying their insureds" by implementing this supposed practice. *Id.* ¶ 35. These assertions are pure, unadulterated hearsay cloaked as expert opinions.

Major acknowledged in his deposition that these assertions are *contrary* to his own experience. In over thirty-plus years as a public adjuster, Major testified he has represented a "long list" of State Farm insureds. Ex. 2 p. 88:5-10. Of those many claims, there was one where Major and State Farm agreed NC LES was appropriate because "the house burnt to the ground." *Id.* pp. 92:21-93:16. In every other claim, State Farm selected RSR LES. *Id.* pp. 93:22-94:6 ("in the cases that I have worked on, they've used the repair/remodel"). He has no personal knowledge of any "commercial practice" on the part of State Farm to improperly select NC LES.

Major testified these assertions are based solely "on conversations" with other unidentified plaintiffs' lawyers and public adjusters. *Id*. p. 251:4-8. Rule 703 does not allow a witness, "under the guise of giving expert testimony, to in effect become the mouthpiece" for introducing hearsay as fact. *Dalgic v. Misericordia Univ.*, No. 3:16-cv-0443, 2019 WL 2867236, at *12 (M.D. Pa. July 3, 2019) (quotations and citations omitted). That is what Major seeks to accomplish: his assertions are not expert opinions, but rather are just inadmissible hearsay contrary to his experience, reporting on what he allegedly heard from others. *See Aronson v. Peoples Nat. Gas*

*Co.*, 180 F.3d 558, 564 & n.2 (3d Cir. 1999) (affirming exclusion of testimony based upon "conversations with others").

## **CONCLUSION**

For the foregoing reasons, State Farm respectfully requests that the Court grant its Motion and exclude the proffered testimony of Jeffrey Major.

Dated:  October 17, 2023                Respectfully submitted,

/s/ *Joseph A. Cancila, Jr.*
Joseph A. Cancila, Jr. (IL 6193252;
PA 310731)
Nick Kahlon (*pro hac vice*) (IL 6280309;
TX 24026891)
Brian Neff (*pro hac vice*) (NJ 056591993)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700
jcancila@rshc-law.com
nkahlon@rshc-law.com
bneff@rshc-law.com

Yolanda Konopacka DeSipio
BENNETT, BRICKLIN & SALTZBURG LLC
960 Harvest Drive
Building B-Suite 100
Blue Bell, PA 19422
(267) 654-1100
desipio@bbs-1aw.com

*Attorneys for Defendant*
*State Farm Fire and Casualty Company*

## <u>CERTIFICATION OF WORD COUNT</u>

I, JOSEPH A. CANCILA, JR., the undersigned, hereby certify subject to Fed. R. Civ. P. 11 that the foregoing brief (excluding the cover page, tables of contents and authorities, signature block and certifications) complies with the 5,000 word-count limit in Local Rule 7.8(b)(2).  According to the word count feature of the Microsoft Word word-processing system used to prepare the brief, the word count is 4,972.

October 17, 2023

/s/ *Joseph A. Cancila, Jr.*

## CERTIFICATION OF SERVICE

I, Joseph A. Cancila, Jr., the undersigned, hereby certify that on October 17.

2023. I served a copy of *State Farm Fire and Casualty Company's Brief in Support
of Motion to Exclude Proposed Expert Jeffrey S. Major*, with accompanying
documents, upon Plaintiffs' counsel listed below via the Court's Electronic Filing
System and E-mail.

> Harry A. Cummins, Esquire
> Roman Rabinovich, Esquire
> Lee Squitieri, Esquire
> Wilkofsky, Friedman, Karel & Cummins
> 299 Broadway, Suite 1700
> New York, NY 10007

/s/ *Joseph A. Cancila, Jr.*