# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

JAMIE BELOTTI, et al.,

      Plaintiffs,

      v.

STATE FARM FIRE AND
CASUALTY COMPANY,

      Defendant.

CIVIL ACTION NO. 3:22-CV-1284

(SAPORITO, J.)

## MEMORANDUM

The plaintiffs, Jamie Belotti and Becky Belotti, initiated this action on January 22, 2021, by filing a praecipe for summons in the Court of Common Pleas of Luzerne County, Pennsylvania naming State Farm Fire Insurance Company as the defendant. (Doc. 1-2, at 3). Thereafter, on July 11, 2022, the plaintiffs filed their complaint in that court. (*Id.*, at 8). The complaint alleges that the plaintiffs sustained a fire loss at their home located at 156 Foote Avenue, Duryea, Pennsylvania. (Doc. 25, ¶ 61). The complaint contains counts for bad faith, 42 Pa. C.S.A. § 8371, a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*, breach of contract, breach of implied covenant of good faith and fair dealing, declaratory relief, and violations of the

1

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-1, *et seq*. The plaintiffs' complaint seeks relief as a class action under Pa. R. Civ. P. 1702, *et seq*. The plaintiffs filed an amended complaint on July 20, 2022. (Doc. 1-2, at 40).

On August 16, 2022, State Farm timely removed this action to this court. (Doc. 1). The plaintiffs filed a second amended complaint on November 1, 2022, under the Class Action Fairness Act, 28 U.S.C. § 1332(d) and Fed. R. Civ. P. 23(b)(2) and (b)(3). (Doc. 25). The action challenges State Farm's use of software by Xactimate, known as "new construction," and its labor efficiency setting to estimate the repair costs for fire damage to the plaintiffs' home. State Farm has now filed a motion for summary judgment seeking to dismiss all claims alleged in the plaintiffs' complaint. (Doc. 42). The parties have briefed the motion (Doc. 43; Doc. 44; Doc. 45; Doc. 55; Doc. 60; Doc. 61), and it is ripe for decision.

## I.    Undisputed Material Facts[1]

The plaintiffs owned a house that was damaged by a fire on September 22, 2019, located at 156 Foote Ave. in Duryea, Pennsylvania

---

[1] All listed facts are taken from the State Farm's "Statement of Facts," (Doc. 44) and admitted by the plaintiffs. (Doc. 55-2).

(the "Property"). (Doc. 44). The Property had been insured by a policy (the "Policy") issued by State Farm and the plaintiffs made a claim under the Policy for the loss caused by the fire. The plaintiffs categorized the damage to the Property as "catastrophic" and "severe." On September 22, 2019, Mr. Belotti notified State Farm of the fire and the next day, State Farm's claim specialist visited the site to inspect the loss. On October 8, 2019, Mr. Belotti advised State Farm he had retained a public adjuster, Brian Evans, to assist the plaintiffs with their insurance claim for the loss to the Property. On October 25, 2019, State Farm retained a contractor, Edward Gieda, to assist with the plaintiffs' claims. Mr. Gieda and the plaintiffs' public adjuster jointly inspected the loss.

On November 18, 2019, Mr. Gieda sent his initial draft estimate to State Farm. Mr. Gieda's initial draft estimate, and State Farm's estimate, used an estimating software tool called Xactimate. After investigating the circumstances of the loss and reviewing the repair line items contained in Mr. Gieda's initial draft estimate, and after discussing the appropriate labor efficiency setting with Mr. Gieda, State Farm's claim specialist, James McDonnell, selected Xactimate's "new construction" labor efficiency for the estimate. Mr. McDonnell selected the "new

construction" labor efficiency because the plaintiffs' home would not be occupied during the repair work, and because once demolition was completed and the wall finishes removed, the repair work would essentially be new construction.

On December 2, 2019, State Farm provided Mr. Evans and Mr. Belotti with its estimate of the repair costs for the plaintiffs' loss. State Farm estimated the Replacement Cost Value ("RCV") of the damage to be $172,015.39 and the Actual Cash Value ("ACV") payment, after applying the Policy's deductible, to be $130,852.61. On the same date, State Farm sent a check and an estimate to the plaintiffs with its ACV payment of $130,852.61. On February 3, 2020, Mr. Evans provided State Farm with a repair estimate he had prepared for the loss to the plaintiffs' home. Mr. Evans's estimate had a RCV of $374,069.77 for the damage to the plaintiffs' home, and it was prepared using Xactimate estimating software, but with the application of the "Restoration/Service/Remodel" labor efficiency setting.

The Policy provides, and both parties agree, that "[i]f [the plaintiffs] and [the defendant] disagree on the amount of loss, either one can demand that the amount of the loss be set by appraisal." (Doc. 55-5, at

4

33); (Doc. 55-2, ¶ 17). On June 16, 2020, State Farm formally demanded appraisal. After agreeing to put its demand for appraisal on hold on June 25, 2020, State Farm renewed its appraisal demand by letter dated August 5, 2020. It informed the plaintiffs' public adjuster that it had named Gary Popolizio as its appraiser on August 26, 2020. At the time State Farm demanded appraisal, the parties were approximately $200,000 apart in their respective Replacement Cost ("RC") estimates. The plaintiffs selected their appraiser, Ismail Bruncaj. (Doc. 45-2, at 89). The appraisers executed an agreement for submission to appraisal on December 23, 2020. (Doc. 45-2, at 41). The appraisal process, however, was prolonged, due in part to complications caused by the COVID-19 pandemic, weather issues, and family deaths experienced by the plaintiffs' appraiser.

On January 4, 2022, the appraisers selected by State Farm and the plaintiffs reached an agreement on the amount of the plaintiffs' loss, and on that date, they entered their appraisal award. (Doc. 45-2, at 42). They agreed that the RCV and the ACV amounts for the plaintiffs' loss were $267,382.04 and $240,643.84 respectively. The appraisal award was not prepared using Xactimate and did not use either Xactimate's "new

construction" or "Restoration/Service/Remodel" labor efficiency settings. On February 1, 2022, State Farm made an additional ACV payment to the plaintiffs in the amount of $66,690.45, the difference between the defendant's previous total ACV payments and the ACV amount of the award.

## II.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial

responsibility of informing the district court of the basis for its motion,"
and demonstrating the absence of a genuine dispute of material fact.
*Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes
such a showing, the non-movant must set forth specific facts, supported
by the record, demonstrating that "the evidence presents a sufficient
disagreement to require submission to the jury." *Anderson*, 477 U.S. at
251–52. In evaluating a motion for summary judgment, the Court must
first determine if the moving party has made a prima facie showing that
it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477
U.S. at 331. Only once that prima facie showing has been made does the
burden shift to the nonmoving party to demonstrate the existence of a
genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477
U.S. at 331.

Both parties may cite to "particular parts of materials in the record,
including depositions, documents, electronically stored information,
affidavits or declarations, stipulations (including those made for the
purposes of the motion only), admissions, interrogatory answers or other
materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to
support or oppose a motion must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.    Discussion

The plaintiffs have alleged six different claims against the defendant: (1) breach of contract; (2) common law breach of an implied covenant of good faith and fair dealing; (3) bad faith in violation of 42 Pa. C.S.A. § 8371; (4) a violation of the Illinois Consumer Fraud and Deceptive Businesses Act; (5) a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; and (6) a declaratory judgment. We shall analyze each claim individually.

### A.    Breach of Contract: Express Terms (Count III)

It is undisputable that a contract existed between the parties. The record shows, and the parties do not dispute, that Jamie and Becky

Belotti were insured by an insurance policy issued by State Farm at the time of the fire. *See generally* (Doc. 55-5); (Doc. 55-2, ¶ 2). Moreover, it is additionally undisputed that plaintiffs purchased a policy that required State Farm to "pay the cost of repair or replacement" of the plaintiffs' losses with "similar construction."[2] *See* (Doc. 55-5, at 30). The plaintiffs, however, do not contest that State Farm failed to pay for the cost of repair and replacement of its losses with similar construction. Indeed, we find that the heart of the plaintiffs' breach of contract claim concerns the defendant's alleged-failure to use a specific method of computation

---

[2] The Policy provides two different options that homeowners may purchase concerning losses to dwellings. These two options are labelled "A1 – Replacement Cost Loss Settlement – Similar Construction" and "A2 – Replacement Cost Loss Settlement – Common Construction." The difference in these policies lies in the quality and types of materials used in the repair or replacement of the losses to a property. The "A1 Similar Construction" necessitates the use of materials and construction similar in quality to those that were previously lost. The "A2 Common Construction" plan only requires the use of materials and construction commonly used by building trades in general. Therefore, as one court has held, "[s]imilar construction' coverage is more favorable to the insured than 'common construction' coverage," as a similar construction plan accounts for more of an individualized repair or replacement for losses rather than a more generalized process under common construction. We note that in this action, the plaintiffs have purchased the "A1 Similar Construction" plan. *See* (Doc. 55-5, at 5).

concerning its assessment of the plaintiffs' losses. In other words, the plaintiffs argue that the defendant was contractually obligated under the Policy to use a specific estimate setting when estimating the value of their losses. The plaintiffs further contend that when the defendant used a "new construction" setting, rather than its required "repair/reconstruction" model, the defendant breached its contract. The defendant has moved for summary judgment on this claim, arguing that it had no contractual duty to use a particular setting when estimating losses and it did not breach its loss settlement obligations. (Doc. 43, at 3–5). Therefore, the underlying issue represents a matter of contract interpretation.

Under Pennsylvania law, insurance policy interpretation is a matter of law for the court. *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. St. John*, 630 Pa. 1, 23, 106 A.3d 1, 14 (2014). The "goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy." *Id.* (citing *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)); *Madison Constr. Co. v. Harlesville Mut. Ins. Co.*, 735 A.2d 100, 1006 (Pa. 1999) ("The polestar of [the court's] inquiry … is the language

of the insurance policy."). "When the language of an insurance policy is plain and unambiguous, [the] court is bound by that language." *Id.*, at 14. Alternatively, if an insurance policy contains an ambiguous term, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.'" *Id.* (quoting *401 Fourth St.*, 879 A.2d at 171). "Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning." *Id.* (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001)). "Finally, the language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety." *Id.* (citing *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997)); *Madison Constr. Co.*, 735 A.2d at 108 (observing that the court "may inform [its] understanding of [insurance policy] terms by considering their dictionary definitions").

The plaintiffs have alleged that the defendant breached the following provision within the Policy:

> [State Farm] will *pay the cost to repair or replace with similar construction and for the same use* on the premises shown in the Declarations, the *damaged part of the property* covered under **SECTION 1 – COVERAGES, COVERAGE A – DWELLING**, except for wood fences, subject to the following:

(1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property;

(2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less;

(3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed;

(Doc. 55-5, at 30) (emphasis added). The plaintiffs have alleged that the language "… pay the cost to repair or replace with similar construction and for the same use … [of] the damaged part of the property" does not include a provision that allows the defendant to use the "new construction" model for damages under this provision. (Doc. 25, ¶ 26). They elaborate that allowing the defendant to use this methodology is "nowhere made a term of the policy nor disclosed in the Policy." (*Id.*, ¶ 28). Moreover, the plaintiffs argue that provision's inclusion of the phrase, "damaged part of the property," necessitates an estimation model

that strictly cover costs to repair or replace, and thus, not a "new construction model." (Doc. 55, at 11). Therefore, the plaintiff not only reads the A1 similar construction provision as a method of computation, but also one that only requires the use of a singular model of estimation.

Upon review of the Policy, however, we find that the plain language of the A1 provision clearly and unambiguously only pertains to the required use of similar construction, *see* (Doc. 55, at 30) ("[State Farm] will pay the cost to repair or replace with similar construction"), and conditions for payment. *See, e.g.,* (*Id.*) ("When the repair or replacement is actually completed, we will pay…."). We cannot identify any language that directly or indirectly concerns any method of computation within the provision, much less any language that requires a singular method of computation. The language of an insurance policy should not be stretched beyond its plain meaning to create ambiguous terms. *Delaware Valley Mgmt., LLC v. Cont'l Cas. Co.*, 572 F. Supp. 3d 119, 127 (E.D. Pa. 2021). The plaintiffs ask us to do so here by reading the inclusion of the phrase "damaged part of the property" as a method of computation rather than its straightforward language: property that has been damaged. The most logical interpretation of the A1 provision simply binds the defendant to

pay for the cost or replacement of damaged property with similar construction. Indeed, the reason that the A1 policy does not include a provision allowing the defendant to use the "new construction model" for damages, as the plaintiffs have articulated, is because the A1 policy is wholly independent from a method of computation. We find that the plaintiffs have failed to provide any additional information that indicates any potential ambiguity or any additional general support for their contention. *See Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) ("If the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous."). Therefore, we find that the Policy unambiguously imposes no contractual duty to use a particular estimate when estimating losses under the A1 provision, and thus, conclude the defendant did not breach any contractual obligation in creating its estimate.

## B.   Breach of Contract: Implied Terms (Count IV)

The plaintiffs allege that State Farm breached an implied covenant of good faith and fair dealing in the contract. Pennsylvania courts have held that "the common law duty of good faith and fair dealing is implied in every contract." *Tubman v. USAA Cas. Ins. Co.*, 943 F. Supp. 2d 525,

529 (E.D. Pa. 2013). Nonetheless, "courts have consistently concluded that a plaintiff cannot bring a freestanding common law bad faith claim and a separate breach of contract claim, as the former is subsumed within the latter." *Durkin, Tr. For Brankr. Est. of Parkhurst v. State Farm Mut. Auto. Ins. Co.*, No. 4:23-CV-00721, 2025 WL 462081, at *5 (M.D. Pa. Feb. 11, 2025) (citing *McDonough v. State Farm Fire & Cas. Co.*, 365 F. Supp. 3d 552, 558–59 (E.D. Pa. 2019)). The plaintiffs have argued that State Farm breached an implied covenant of good faith and fair dealing when State Farm used the "new construction" pricing method rather than the "repair/reconstruction pricing." (Doc. 25, ¶ 11). Indeed, this claim mirrors the plaintiffs' breach of contract claim, and because we have previously dismissed that claim, we find that the plaintiffs' claim of breach of implied covenant of good faith and fair dealing must additionally be dismissed. We shall therefore grant the defendant's motion for summary judgment as to Count IV.

## C.   Statutory Bad Faith Under § 8371 (Count I)

The plaintiffs have brought additional claims against State Farm under Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371. The Pennsylvania legislature enacted § 8371 as a private cause of action

against insurance companies specifically where insurance companies fail to act in good faith in response to an insurance claim. *See Metro. Grp. Prop. & Cas. Ins. Co. v. Hack*, 312 F. Supp. 3d 439, 444–45 (M.D. Pa. 2018). To establish bad faith, a plaintiff must demonstrate, by clear and convincing evidence "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999) (quoting *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997)). This statute encompasses a broad range of insurer conduct. *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 524 (W.D. Pa. 2012). An insurer, however, does not need to show correct estimations, but rather a reasonable basis for its decision to deny benefits. *Id.*

A bad faith claim under § 8371 is distinct from the predicate claim. *Nealy v. State Farm Mut. Auto. Ins. Co.*, 695 A.2d 790, 793 (Pa. Super. Ct. 1997). There must therefore be a predicate claim for a § 8371 claim to proceed. *Nye v. State Farm Mut. Auto. Ins. Co.*, No. 3:21-CV-01029, 2022 WL 969620, at *4 (M.D. Pa. Mar. 30, 2022). A breach of contract claim can serve as one such predicate action. *Id.* However, a dismissal of a claim

that removes the predicate cause of action otherwise required to accompany the § 8371 claim in turn requires the dismissal of the bad faith claim. *Id.* Here, the plaintiffs have explicitly listed at least eighteen separate actions by State Farm within their complaint that they allege prove bad faith on behalf of the defendant. *See* (Doc. 25, ¶ 79) (emphasizing that the list is not limited to those stated actions). Nonetheless, these actions can be consolidated into two independent predicate claims: (1) bad faith for State Farm's alleged "manipulation of the Xactimate estimating application"; and (2) bad faith for State Farm's use of the appraisal process. (Doc. 55, at 30). The plaintiffs' claims for bad faith concerning State Farm's alleged "manipulation of the Xactimate estimating application," however, rely on the plaintiffs' predicate breach of contract claim for that same allegation. We have previously dismissed the breach of contract claim, and as courts have held, "the court's dismissal of the breach of contract claim removes the predicate cause of action otherwise required to accompany the section 8371 claim." *Nye,* No. 3:21-CV-01029, 2022 WL 969620, at *4.

In asserting a bad faith claim, the plaintiffs make allegations of

State Farm's bad faith throughout the appraisal process.[3] We find, however, that the plaintiffs have failed to identify any evidence of "any frivolous or unfounded refusal to pay proceeds of a policy" as required by a bad faith claim. *Wolfe v. Allstate Property & Cas. Ins. Co.*, 790 F.3d 487, 498 (3d Cir. 2015). The record shows that State Farm provided a check to the plaintiffs for its estimated damages the same day it provided the plaintiffs with an estimated cost of repairs. *See* (Doc. 55-2, ¶¶ 16, 19). Moreover, it is undisputed that State Farm paid an additional $66,690.45, the difference between State Farm's estimate and the ultimate appraisal award, promptly after the conclusion of the appraisal process. (*Id.*, ¶ 47). We agree that "[t]he fact the parties' appraisers ultimately assigned a higher value to the claim than State Farm's estimate … does not mean State Farm … acted in bad faith" (Doc. 43, at 6), as the Third Circuit has succinctly noted "[t]hat is, after all, what the

---

[3] We note some of the plaintiffs' specific allegations: "(d) by compelling Plaintiffs to institute the costly and time consuming appraisal process and this lawsuit to obtain policy benefits that Defendant, State Farm, should have paid promptly and without the necessity of an appraisal and litigation;" (i) by compelling the Plaintiffs to engage in unnecessary Appraisal"; and "(k) by low balling and extremely undervaluing the Plaintiffs' loss which has now been established by an Appraisal Award which was substantially in excess of the amount that the Defendant was willing to pay." (Doc. 25, at 15).

appraisal process is for–settling disputes about the value of a claim."
*Mirarchi v. Seneca Spacialty Ins. Co.*, 564 F. App'x 652, 656 (3d Cir. 2014)
(citation omitted).

Nonetheless, the plaintiffs can additionally prove bad faith in an appraisal process by providing clear and convincing evidence that State Farm: (1) delayed payment of a claim; (2) without reasonable basis for causing the delay; and (3) it knew or recklessly disregarded the lack of a reasonable basis for the delay. *Mirarchi*, 564 F. App'x at 656–57 (citing *Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 369–70 (E.D. Pa. 2011)). As we noted previously, once payment was required, State Farm promptly paid the plaintiffs. Therefore, the plaintiffs' bad faith claim must involve the unreasonable delay in the appraisal process itself. The plaintiffs, however, have failed to provide clear and convincing evidence that State Farm unreasonably caused a delay in the appraisal process.

The plaintiffs admit they originally rejected State Farm's attempts to seek appraisal. (Doc. 55-2, ¶ 28). Moreover, once State Farm initiated the appraisal process, the plaintiffs admit that "'State Farm agreed to temporarily put [its] demand for Appraisal on hold pending the outcome of further discussions between Plaintiff's public adjuster and State

Farm's contractor." (Doc. 55-2, ¶ 31). Indeed, the plaintiffs' adjustor acknowledges that State Farm attempted to resolve the claim amicably. (Doc. 45-2, at 101). Furthermore, the plaintiffs admit that once the appraisal process resumed, the process was prolonged by factors independent of State Farm's action. (Doc. 55-2, ¶ 35) (admitting that the "appraisal process was prolonged, due in part to complications caused by the COVID-19 pandemic, weather issues, family deaths experienced by Plaintiffs' appraiser, and Plaintiffs halting the process and cancelling a scheduled inspection apparently in order to consult with lawyers."). A mere showing that an appraisal process consisted of a long period does not, in itself, constitute an unreasonable delay in an appraisal process. *See Borden v. NGM Ins. Co.*, 660 F. Supp. 3d 322, 330 (E.D. Pa. 2023) (citations omitted) ("[A] long period of delay between demand and settlement does not, on its own, necessarily constitute bad faith"). For these reasons, we find that the plaintiffs have failed to provide any information that create a genuine dispute of material fact about any unreasonable delay or failure to pay the proceeds of the Policy.

Indeed, the plaintiffs' bad faith allegations appear to take issue with the plaintiffs' required participation in the appraisal process rather

than State Farm's refusal to pay any proceeds. *See* (Doc. 55, at 34) ("State Farm Acted in Bad Faith by Compelling the Plaintiffs to File Suit" and "State Farm Acted in Bad Faith by Demanding Appraisal When There Was Not Yet a Ripe Disagreement Regarding the Amount of the Loss."). The plaintiffs, however, admit that they agreed to a contract that explicitly stated: "If [either party disagrees] on the amount of loss, either one can demand that the amount of the loss be set by appraisal." (Doc. 55-5, at 33); (Doc. 55-2, ¶ 17). Moreover, insurance contracts commonly include appraisal clauses as the "well-established public policy of Pennsylvania encourages the settlement of disputes about the amount of loss by appraisal." *Williamson v. Chubb Indem. Ins. Co.*, No. 11-CV-6476, 2012 WL 760838, at *4 (E.D. Pa. Mar. 8, 2012) (citing *Ice City v. Ins. Co. of N. Am.*, 314 A.2d 236, 241 (Pa. 1974)). Therefore, we find that State Farm merely asserted a valid contractual right when it requested appraisal concerning the difference in the parties' evaluations. Indeed, "[t]hat is, after all, what the appraisal process is for–settling disputes about the value of a claim." *Mirarchi*, 564 F. App'x at 656. The plaintiffs' bad faith claims under § 8371 will be dismissed.

**D.    Violations of the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA") (Count II)**

The plaintiffs allege State Farm violated the ICFA by knowingly and intentionally concealing and failing to disclose material facts regarding the coverage of its policies and practices with respect to estimating and adjusting property losses. (Doc. 25, at 17). The ICFA is Illinois's parallel version of Pennsylvania's UTPCPL, and its purpose is to "protect consumers from unfair and deceptive business practices." *Seidl v. Artsana USA, Inc.*, 643 F. Supp. 3d 521, 534 (E.D. Pa. 2022) (citing *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)). The elements for a successful ICFA claim resemble those for a successful claim under the UTPCPL, as a plaintiff must prove: "(1) the defendant engaged in a deceptive act or practice; (2) the defendant intended the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving a trade or commerce." *Seidl*, 643 F. Supp. 3d at 534 (citing *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2010)). In some capacity, the plaintiff must allege that the seller's deceptive practice caused the buyer harm. *Id.*

The defendant, in response to the plaintiffs' allegation, cites *Avery*

*v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (2005) as evidence that the ICFA "does not have extraterritorial effect." *Id.* at 852–853. *Avery* observed that plaintiffs "may sue under [the ICFA] only if the circumstances relating to the alleged fraudulent transaction occurred mostly in Illinois." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (citing *Avery*, 835 N.E.2d at 852–53). State Farm moves for summary judgment, arguing that the plaintiffs failed to show the necessary connections to Illinois to sue under the ICFA.

We find *Avery* applicable to this case. The court in *Avery* decertified a nationwide class action against State Farm under the ICFA and held that non-Illinois residents lacked standing to sue under the statute. *Avery*, 835 N.E.2d at 849–55. It explained that while the statute does not apply to "fraudulent transactions which take place outside Illinois," *id.* at 853, "a plaintiff may pursue a private cause of action under the [ICFA] if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Id.* at 853–854. The court weighed a multitude of factors to determine what constituted transactions occurring "primarily and substantially" in Illinois, such as: (1) the plaintiffs' place of residence, (2) where the damage occurred, (3) whether

23

the plaintiffs communicated with the insurer or its agents in Illinois, or (4) the location of the alleged misrepresentation. *Id.* at 854–55. The court, however, "rejected the notion that an allegation that a defendant was headquartered in Illinois or that its deceptive practices flowed from Illinois was sufficient to assert a claim." *Morrison v. YTB Int'l, Inc.,* 641 F. Supp. 2d 768, 775 (S.D. Ill. 2009) (citing *Avery,* 835 N.E.2d at 855). In other words, *Avery* concluded that "where the only connection with Illinois is the headquarters of [the] defendant" or the fact that a scheme "emanated" from Illinois, the ICFA "does not apply to the claims of the non-Illinois plaintiffs[.]" *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 340 n.10 (N.D. Ill. 1997).

The record does indeed show that State Farm's headquarters lie in Illinois and any formulated policy language used in its insurance contracts presumably occurs within the same state, including the processing of those contracts. (Doc. 25, at 1).[4] These, however, appear to

---

[4] The location of State Farm's headquarters is neither admitted nor denied in either party's "Statement of Facts." *See* (Doc. 55-2). The closest admission is contained in the plaintiffs' statement that "[t]he policy was countersigned by State Farm offices in Illinois." (*Id.*, at 4). Nonetheless, the location of the headquarters is not disputed, and thus, we interpret it as an admitted fact.

be the only connections to Illinois in the underlying lawsuit. After carefully reviewing the record, we find that these contacts do not establish the necessary Illinois connections to file a suit under the ICFA. *See Crichton,* 576 F.3d at 396 (noting *Avery's* holding that consumers could not avail themselves of the ICFA based solely on the location of the insurer's headquarters).

State Farm offers persuasive evidence as proof that many transactions occurred in Pennsylvania, not Illinois. The plaintiffs' insured place of residence was located within Pennsylvania. (Doc. 55-2, ¶ 1). The plaintiffs entered into their insurance contract in Pennsylvania. (*Id.*, ¶ 85). Moreover, the damage to the Property occurred in Pennsylvania. (*Id.*, ¶ 1). Finally, the plaintiff and the defendant frequently communicated within the state. *See generally* (*Id.*). In short, the record shows that the majority of the parties' transactions occurred "primarily and substantially" in the Commonwealth of Pennsylvania, rather than Illinois. While we acknowledged that State Farm has its headquarters in Illinois and it formulates policy language at that location (Doc. 55-3, at 4), Illinois courts have held that these connections alone are insufficient to allow actions under the Illinois statute. *See Crichton,*

576 F.3d at 397 (finding that the plaintiff lacked standing to sue under the ICFA as the majority of the parties' transactions occurred out-of-state, despite the defendant's home office being in Illinois from which it issued insurance policies); *See generally Phillips v. Bally Total Fitness Holding Corp.*, 372 Ill.App.3d 53, N.E.2d 310 (2007) (holding that even though the defendant's headquarters was located in Illinois, the plaintiffs lacked standing to sue under the ICFA because the plaintiffs resided out-of-state, purchased club memberships out-of-state, and dealt with agencies out-of-state). For these reasons, we will grant the motion for summary judgment as to Count II.

### E.    Violations of the Unfair Trade Practices and Consumer Protection Law (UTPCPL) (Count VI)

The plaintiffs allege that State Farm violated the Pennsylvania UTPCPL by using the "new construction" efficiency standard instead of the "Restoration/Service/Remodel" efficiency model to intentionally reduce the value of claims. The UTPCPL seeks to prevent "[u]nfair methods of competition and unfair deceptive acts or practices in the conduct of any trade or commerce...." *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC,* 40 A.3d 145, 151 (Pa. Super. Ct. 2012) (quoting 73 Pa. Stat. Ann. §§ 201–3). While the UTPCPL applies to the sale of an

insurance policy, it does not apply to the handling of insurance claims. *Wenk v. State Farm Fire & Cas. Co.*, 228 A.3d 540, 550 (Pa. Super. Ct. 2020); *Holovich v. Progressive Specialty Ins. Co.*, 600 F. Supp. 3d 572, 584 (E.D. Pa. 2022). Therefore, to the extent that the plaintiffs may argue their claim lies in State Farm's failure to pay or mishandling of their claims, the UTPCPL does not apply. *See Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 307 (3d Cir. 1995) (citing *Gordon v. Pa. Blue Shield*, 548 A.2d 600, 604 (Pa. Super. Ct. 1988)).

The plaintiffs' argument focuses on State Farm's sale of the insurance policy rather than its handling of the claim itself, as the plaintiffs argue that "[h]ad [State Farm] not engaged in deceptive acts and practices alleged herein, [the plaintiffs] would not have purchased insurance coverage from State Farm…." (Doc. 25, at 26). Specifically, the plaintiffs argue that their claim falls under the UTPCPL's catch-all provision, where a plaintiff must prove: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." *Hall v. Equifax Info. Servs. LLC*, 204 F. Supp. 3d 807, 810 (E.D. Pa. 2016) (citing *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D.

285, 292 (W.D. Pa. 2014)). State Farm moves for summary judgment on the premise that the plaintiffs cannot prove the elements of the catch-all provision.

First, we analyze whether State Farm's use of the "new construction" estimation method constitutes "a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances." Our analysis runs parallel to our finding concerning the plaintiffs' breach of contract claim. We have already found that the plain language of the Policy makes no mention of the necessity to use a particular labor efficiency or method of computation. Moreover, the plaintiffs have failed to offer any evidence suggesting otherwise. Indeed, the plaintiffs admit that they could not identify any misrepresentations, omissions, or concealment of information by State Farm. (Doc. 55-2, ¶ 91). Therefore, on the record before us, we find that State Farm's use of the "new construction" estimation method cannot be categorized as a deceptive act.

Nonetheless, we must note that even if we found that the use of the "new construction" estimation method constituted a "deceptive act," the plaintiffs have additionally failed to prove justifiable reliance. The plaintiffs have alleged that they were deceived into thinking that State

Farm would use a particular estimation method dependent on the type of loss.[5] The plaintiffs, however, have failed to provide any supporting evidence that they somehow believed State Farm would use a particular method of computation, and more importantly, relied on that belief when purchasing their plan. *See Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 n.4 (3d Cir. 2008) (emphasizing that a plaintiff "must show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation."). Indeed, the defendant has offered testimony from the plaintiffs that they never read the Policy, and thus, could not have possibly relied on a method of computation for its purchase.[6] (Doc. 55-2, ¶ 92). As justifiable reliance must be proven affirmatively, *Hunt*, 538 F.3d at 227 (finding that plaintiffs do not "enjoy[] a presumption of reliance"), we will grant the

---

[5] *See, e.g.,* (Doc. 25, ¶ 138) (alleging that State Farm's practices "were likely to and, in fact, did deceive reasonable consumers, including Plaintiffs…."; (*Id.*, ¶ 139) (alleging that using "new home construction" pricing in lieu of the expensive "repair/remodel" pricing would have been "important to [the plaintiffs] purchase decisions with respect to [State Farm's] insurance coverage.").

[6] The plaintiffs have denied this fact in their response to the defendant's statement of material facts. (Doc. 55-2, ¶ 92). In their counterstatement, they do not provide any information that disputes the evidence. *See* (Doc. 55-3, at 5). Instead, they provided a generalized response that concludes that "State Farm deceived Plaintiffs…". (*Id.*).

defendant's motion for summary judgment as to Count VI, as the plaintiffs have failed to provide any evidence creating a genuine dispute of material fact concerning a reliance on a specific method of computation when purchasing their plan. *See Walkup v. Santander Bank, N.A.,* 147 F. Supp. 3d 349, 362 (E.D. Pa. 2015) (granting dismissal when a plaintiff failed to articulate "a factually plausible account on their extensive reliance on [d]efendants' conduct").

## F.    Request for Declaratory Judgment (Count V)

The plaintiffs assert a claim for relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201. The Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether further relief is or could be sought." 28 U.S.C. § 2201(a). "District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). Moreover, the Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."

*Id.* at 287 (internal quotations and citations omitted). Here, the plaintiffs

specifically ask for a declaration that:

> [I]n paying non-total-loss claims by first-party insureds,
> it is a breach of [State Farm]'s insurance contract, as
> well as a violation of law, for [State Farm] to base the
> valuation and payment of claims on "new construction"
> pricing rather than "repair/remodel" pricing
> substantially undervaluing the cost of repair….

(Doc. 25, ¶ 128).

Courts within the Third Circuit have consistently found that the

party seeking declaratory judgment has the burden of establishing the

existence of an actual case or controversy. *Team Angry Filmworks, Inc. v.*

*Geer*, 214 F. Supp. 3d 432, 441 (W.D. Pa. 2016); *Dodge-Regupol, Inc. v.*

*RB Rubber Prod., Inc.*, 585 F. Supp. 2d 645, 650 (M.D. Pa. 2008) (quoting

*Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir.

2007)) ("[a] party seeking to base jurisdiction on the Declaratory

Judgment Act bears the burden of proving that the facts alleged, 'under

all the circumstances, show that there is a substantial controversy,

between the parties having adverse legal interests, of sufficient

immediacy and reality to warrant the issuance of a declaratory

judgment.'"). The plaintiffs have based their request for a declaratory

judgment on the same claims that we have dismissed in the underlying

action.[7] Therefore, as we found there were no genuine issues of material fact precluding us from granting summary judgment on the plaintiffs' additional claims, we will grant summary judgment as to this claim because the plaintiffs no longer plead claims with an existing actual case or controversy. *See Brugler v. Unum Grp.*, No. 4:15-CV-01031, 2018 WL 5732680, at * 4 (M.D. Pa. Nov. 2, 2018) (granting summary judgment on the plaintiff's declaratory judgment claim due to the absence of genuine issues of material fact concerning the declaratory judgment).

## IV.    Conclusion

For the foregoing reasons, the defendant's Rule 56 motion for summary judgment (Doc. 42) shall be granted. We note that the plaintiffs and State Farm have two other pending motions: (1) the plaintiffs' motion to certify a class and subclass concerning the claims filed in its complaint (Doc. 54); and (2) the defendant's motion to exclude testimony of the plaintiffs' proposed witness. (Doc. 71). Our ruling, however, now renders these two motions moot and thus, those motions will be denied.

---

[7] It is clear that the language used in the request for declaratory judgment, "*breach of [State Farm]'s insurance contract*, as well *as a violation of law*," encapsulates the plaintiffs' claims for: (1) bad faith, (2) breach of contract, (3) breach of implied covenant and good faith and fair dealings, (4) violations of the ICFA, and (5) violations of the UTPCPL.

An appropriate order follows.


Dated: March 25, 2025          *s/Joseph F. Saporito, Jr.*
                               JOSEPH F. SAPORITO, JR.
                               United States District Judge